IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARITO V. CANALES and BENJAMIN J. BARDZIK,<br><br>Plaintiffs,<br>v.<br><br>LEPAGE BAKERIES PARK STREET LLC, CK SALES CO., LLC, and FLOWERS FOODS, INC.,<br><br>Defendants. | Civil Action No. 4:21-cv-40065 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**

Defendants Lepage Bakeries Park Street, LLC ("Lepage"), CK Sales Co., LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers Foods") (collectively, "Defendants"), by and through undersigned counsel, submit this Memorandum of Law in Support of Defendants' Motion to Dismiss or, in the Alternative, to Compel Arbitration.

**I.   Introduction**

Plaintiffs Margarito Canales and Benjamin Bardzik ("Plaintiffs") are current independent distributor franchisees who have Distributor Agreements with CK Sales via T&B Dough Boys, Inc. ("T&B" or "Distributor") which they co-own and operate. Under these Distributor Agreements, Plaintiffs purchased exclusive distribution rights to sell and distribute Lepage products to customers within defined geographic territories. Since 2018, Plaintiffs have owned a total of five territories and currently own four.

Plaintiffs' have agreed as part of their Distributor Agreements to arbitrate disputes with Defendants. The agreement to arbitrate includes any disputes arising out of any association that Plaintiffs may have with Defendants. Covered disputes include tort claims, discrimination claims,

B0116279.11

retaliation claims, and claims for unpaid compensation, civil penalties or statutory penalties under either federal or state law.

Despite their contractual commitments to arbitrate, Plaintiffs filed this lawsuit on June 17, 2021. (Dkt. Entry No. 1 hereinafter cited as "Compl."). They allege that they were misclassified as independent contractors and, as a result, are entitled to relief under Massachusetts law. (Counts I-IV). They also allege breach of contract, unjust enrichment, fraud/misrepresentation[1] and breach of the implied covenant of good faith and fair dealing. (Counts V-VIII).

In light of the foregoing, the Court should dismiss Plaintiffs' lawsuit in favor of arbitration. Plaintiffs agreed both in their individual capacity and on behalf of their company to submit such disputes to binding arbitration consistent with the Arbitration Agreements.[2] Accordingly, Defendants respectfully request that the Court dismiss this lawsuit pursuant to Fed. R. Civ. P. 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, or in the alternative, stay this action and compel that they separately arbitrate their disputes consistent with the terms of the Arbitration Agreements.

**II.     Relevant Factual Background**

    **A.     The Parties**

Flowers Foods is the parent holding company of numerous operating subsidiaries, which bake fresh breads, buns, rolls, and snack cakes. ***Exhibit A, Declaration of Jake Linthicum*** (hereinafter cited as "Linthicum Decl."), at ¶ 2. Lepage is one such Maine based subsidiary which Flowers acquired in 2012. The brands produced by Lepage and other Flowers Foods' bakeries

---

[1] Notably, as part of the fraud/misrepresentation claim, Plaintiffs allege that they were falsely told Massachusetts law required their business to buy three territories. Plaintiffs not only bought three territories in 2018, but opted to buy a fourth territory a year later in June 2019 and a replacement fourth territory in 2020. While Defendants dispute this fraud/misrepresentation allegation, in light of Plaintiffs' purchases and sales, the relevance of this allegation to this lawsuit is questionable as is the claim.

[2] Counsel for the parties conferred on this issue with Plaintiffs' declining voluntarily to dismiss this lawsuit and arbitrate the claims as required under the Arbitration Agreements.

include Country Kitchen, Nature's Own, Dave's Killer Bread, Wonder, and Tastykake. Lepage uses a direct-store-delivery ("DSD") system whereby independent distributor franchisees, like Plaintiffs, purchase distribution rights to sell and distribute products in a defined geographic area ("territory").  *Id.*, at ¶3.

CK Sales, wholly owned by Lepage, is in the business of selling the distribution rights to the independent franchisee distributors.  Distributor Agreements govern the relationships between CK Sales and distributors.  *Id.*, at ¶3.

Plaintiffs formed T&B in 2018.  A true and accurate copy of T&B's By-laws which are maintained in Plaintiffs' Distributor file is attached to ***Linthicum Decl***. as Attachment 1.  Canales owns 51% of T&B and Bardzik owns 49%.  *Id.*  Canales serves as T&B's President and Secretary and Bardzik serves as the Vice-President and Treasurer of their franchise.  Canales and Bardzik are the only Directors of their company and have authorized Canales to sign all legal documents on behalf of their company.  *Id.*, at ¶4.

### B. Plaintiffs' Acquisition of Franchised Territories

In June 2018, Plaintiffs, through T&B, purchased the franchised distribution rights to three territories, all of which receive product at a warehouse located in North Reading, Massachusetts. Both Plaintiffs signed the Distributor Agreement for these three territories.  Canales signed for the Company.  Bardzik also asked to sign as a co-owner and signed on the line marked for a witness. ***Linthicum Decl.***, at ¶5.  Canales signed the separate Arbitration Agreement attached to the Distributor Agreement as Exhibit K to those Agreements both on behalf of the Company and the individual owners.  Notably, Canales and Bardzik each signed a separate Personal Guaranty (Exhibits F to the Distributor Agreement).  As part of the Personal Guaranty both Canales and Bardzik expressly agreed and acknowledged that "he/she is subject to the Arbitration Agreement

attached hereto as Exhibit K." The Arbitration Agreement obligates the corporate Distributor and all of its owners to arbitrate disputes with regard to any claim with Defendants whether or not such claims arose out of the Distributor Agreement. Attachment 2 to the ***Linthicum Decl.*** is a true and accurate copy of the Distributor Agreement, the two Personal Guaranties (Exhibits F) and the Arbitration Agreement (Exhibit K).[3] ***Id.***

Plaintiffs personally operated the three territories. They had their company, T&B, hire part time employees to assist in the operation of their business in the three territories. ***Id.***, at ¶6.

In June 2019, one year after Plaintiffs purchased their original three territories, Plaintiffs purchased a fourth territory.[4] As part of their purchase of the fourth territory in June 2019, Plaintiffs submitted a business plan, which Lepage maintained in their Distributor file. A true and accurate copy of this business plan is attached to the ***Linthicum Decl.*** as Attachment 4. ***Id.***, at ¶8. In this business plan, Plaintiffs represented that they are essentially "50/50 partners" in the business. As part of this busines plan, Plaintiffs discussed their plan as owners of an independent business to grow the business in this fourth territory by adding accounts and selling additional brands such as organic bread to additional accounts. They planned to work closely with each other and the employee they hired to work full time in this fourth territory to make sure the right product got ordered, special items were set up for the weekend and that they had sufficient quantity of product to satisfy the seasonal demands of their customers. They hired the employee to work in the territory five days a week and Plaintiffs planned for themselves to merchandise product at large customers in this fourth territory on the two non-delivery days, Wednesdays and Sundays. ***Id.***

---

[3] Only the two exhibits to the Distributor Agreements specifically referenced in this memorandum (Exhibits F and K) have been attached hereto. All other exhibits to the Distribution Agreements were omitted.

[4] Canales signed the Distributor Agreement for this fourth territory and signed the separate Exhibit K Arbitration Agreement on behalf of T&B and the individual owners. Bardzik signed both documents on the witness line. ***Id.***, at ¶7.

In October 2020, Plaintiffs negotiated for CK Sales to buy back the fourth territory purchased in 2019, to facilitate Plaintiffs' purchase of a different fourth territory that was closer geographically to the first three territories purchased. Plaintiffs signed the Distributor Agreement for this replacement fourth territory. Bardzik signed on the witness line and he further noted that he was signing as Vice President of the Distributor. Plaintiff Canales signed the Arbitration Agreement (Exhibit K to the Distributor Agreement) on behalf of the Distributor and the Distributor's owners. *Id.*, at ¶9. A true and accurate copy of the Distributor Agreement and Arbitration Agreement for this replacement fourth territory is attached to **Linthicum Decl.** as Attachment 5. Plaintiffs submitted a second busines plan for the operation of the acquisition of this fifth territory, a copy of which is attached to **Linthicum Decl.** as Attachment 6. The Plaintiffs projected additional profits for their business T&B as a result of their acquisition of this territory and as business owners growing that territory with a T&B employee servicing the route five days a week. *Id.*

As the co-owners of T&B, and as acknowledged in the business plans they submitted to CK Sales, Plaintiffs were and remain responsible for operating their business. *Id.*, at ¶10. Such responsibilities include hiring employees at their discretion to operate their four territories; identifying and engaging potential new customers; developing relationships with key customer contacts; ordering products based on customer needs; servicing the customers in their territory, stocking and replenishing product at the customer locations; removing stale product; and other activity necessary to promote sales, customer service and otherwise operate their independent business. *Id.* Moreover, under the Distributor Agreements, including those executed by Plaintiffs, Distributors do not have to perform any services personally.[5]

---

[5] In addition to not having to perform personally any services, neither Plaintiffs nor those they hire were required to cross state lines in operating T&B as all of their territories were entirely in Massachusetts. **Linthicum Decl.** at ¶11.

T&B derives its revenue by its purchase of products from Lepage which it resells to T&B's customers at a marked-up price. The difference between the sale price and the purchase cost, less any business expenses, represents the "profit margin" for Plaintiffs' business. Consistent with the Plaintiffs' business plans, because Plaintiffs' independently owned business is compensated based on the sale of products (Plaintiffs' business compensates Plaintiffs; the Defendants do not) it is in Plaintiffs' best interests to devote necessary time to increasing sales in their businesses' accounts.[6]

### C.     The Arbitration Agreements

The Arbitration Agreements cover any and all claims pertaining to Plaintiffs' distributorships, explicitly referencing any claims challenging their independent contractor status and claims for compensation. Specifically, the Arbitration Agreements state:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein[7], that either DISTRIBUTOR (including its owner or owners) may have against COMPANY (and/or its affiliated companies …) or that COMPANY may have against DISTRIBUTOR … arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including … any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein.…
>
> . . .
>
> Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, … claims for alleged unpaid compensation, … or statutory penalties under either federal or state law.

*Agreements*, ¶¶ 1, 7.

---

[6] Because Plaintiffs' company owns the four territories, their company can build equity in the franchised territories. The value of the territories can appreciate in value and can be sold for a profit. *Id.,* at ¶ 12.

[7] No applicable exclusions apply. *Agreements*, ¶¶ 8-9.

The Arbitration Agreements also require that Plaintiffs must separately pursue covered claims rather than jointly:

> All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no bench or jury trials and no class, collective, representative, or multi- plaintiff actions are permitted under this Arbitration Agreement.…

Agreements, ¶ 3.

Indeed, the Arbitration Agreements emphasize the multi plaintiff action waiver, stating the following, in bold, capital letters:

> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

Agreements, ¶ 4.

The Arbitration Agreements are clear that "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi- plaintiff

action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court."

*Agreements*, ¶ 5.  When signing the Arbitration Agreements, Plaintiffs acknowledged:

> …**this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel**;

and he

> **understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that such disputes must be brought on an individual basis only.**"

*Agreements*, ¶¶ 12, 14 (emphasis in original).

Under the Arbitration Agreements, CK Sales undertook the obligation to pay for all filing fees and costs typically associated with American Arbitration Association ("AAA") arbitration, subject to the arbitrator's ability to award CK Sales costs and fees if it is as the prevailing party. *Agreements*, ¶ 2.  Further, the agreement to arbitrate covered claims is mutual, the arbitration is conducted by a neutral arbitrator, and the arbitrator has the authority to award the same damages and other relief that would be available in court under applicable law, including attorneys' fees and costs.  *Agreements*, ¶¶ 1- 3.  The Arbitration Agreements state that they "shall be governed by the FAA and Massachusetts law to the extent Massachusetts law is not inconsistent with the FAA.  Agreements, ¶ 13.

**II.     Argument and Authorities**

The FAA pronounces a policy liberally favoring enforcement of arbitration agreements.  9 U.S.C. § 1, *et seq*.; ***AT&T Mobility, LLC v. Conception,*** 131 S. Ct. 1740, 1745 (2011).  Under the FAA, "a written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract." 9 U.S.C. § 2. Section 4 of the FAA specifically provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4; *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 (1991). As the First Circuit Court of Appeals has explained, "The Supreme Court has made clear that where the parties have agreed to arbitrate, the FAA requires 'courts [to] rigorously enforce arbitration agreements according to their terms.'" *Bossé v. New York Life Insurance,* 992 F.3d 20, 27 (1st Cir. 2021), *quoting Am. Express Co., v. Italian Colors Rest.,* 570 U.S. 228, 233, 133 S.Ct. 2304, 186 L.Ed.2d 158 (2013) and *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.ed.2d 158 (1985). *see also Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 111 (2001).

In adjudicating motions to compel under the FAA, the moving party "must show the existence of a valid and binding agreement to arbitrate, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and the claim comes within the clause's scope." *Keane v. ALPS Fund Services, Inc.,* 2020 WL 7321055, *2 (D.Mass. 2020), *citing Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino,* 640 F.3d 471, 474 (1st Cir. 2011).

    A.    **Plaintiffs Agreed to Arbitration.**

To determine whether the parties agreed to arbitrate a given dispute, ordinary principles of state contract formation law apply. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In this instance, Massachusetts law applies. *Distributor Agreements*, ¶ 20.11. Likewise, the Arbitration Agreements (Exhibit K to the Distributor Agreements) reconfirm that Massachusetts law applies to the extent not inconsistent with the FAA. *Agreements*, ¶ 13. Once Defendants establish that the Plaintiffs have agreed to arbitration, Plaintiffs then bear the burden

of establishing that such Arbitration Agreements are inapplicable or invalid. ***Green Tree Fin. Corp.-Alabama v. Randolph***, 531 U.S. 79, 91 (2000).

In this case, there is no question that the parties agreed to arbitration. The Arbitration Agreements are clear, unambiguous, and provided Plaintiffs with ample and prominent notice of their rights. Plaintiffs each made an informed decision to sign the Arbitration Agreements (in the manner described above), after being explicitly advised that it affected their legal rights and that they may want to consult a lawyer. Importantly, in addition to signing the Arbitration Agreements, to remove any doubt as to Plaintiffs' agreement to arbitrate disputes, Plaintiffs each signed a separate Personal Guaranty in 2018, in which they each acknowledged their obligation to arbitrate all disputes in accordance with the terms and conditions of the Arbitration Agreement.[8] Moreover, the Arbitration Agreements are supported by adequate consideration under Massachusetts law. ***Keane, supra,*** at 3. "Consideration can…be provided by a mutuality of promises to arbitrate… Under Massachusetts law, the requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promise." ***Id., quoting DeLuca v. Bear Stearns & Co.,*** 175 F.Supp. 2d 102, 112 (D. Mass. 2001).

    **B.**    **The Parties Delegated to Arbitration Any Decision Regarding the Scope of the Arbitration Agreements.**

Enforcement of the parties' agreement to arbitrate disputes includes "enforcement of delegation clauses." ***Bossé, supra,*** at 27. [W]here the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide." ***Id., quoting Henry***

---

[8] As noted above, the Arbitration Agreement signed in 2018 not only covers disputes arising out of the Distributor Agreement but also arising out of any other association that the Plaintiffs as owners of T&B have with the Defendants. Thus, Plaintiffs' commitment in 2018 to arbitrate any and all disputes is an agreement to arbitrate all disputes of any kind from June 2018 to the present.

***Schein, Inc. v. Archer & White Sales, Inc.,*** __U.S.___, 139 S.Ct. 524, 530 202 L.Ed. 2d 480 (2019).

In this case, the Arbitration Agreements provide that, with the exception of the multi plaintiff waiver and the applicability of the FAA, "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement … shall be resolved by the arbitrator" – evidencing the parties' express agreement to delegate issues of arbitrability. ***Agreements***, ¶ 5; ***Considine***, 124 F. Supp. 3d at 90 (collecting cases on express delegation). Further, the Arbitration Agreements state that any arbitration will be held "in conformity with the Commercial Arbitration Rules of the American Arbitration Association." ***Agreements***, ¶ 1. The AAA's Commercial Rule 7 provides that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Via incorporation of the AAA's rules, including Rule 7, the parties clearly and unmistakably delegated questions of arbitrability, including scope, to the arbitrator. ***See Contec Corp. v. Remote Solution, Co., Ltd.***, 398 F.3d 205, 208 (2d Cir. 2005) (holding that arbitrator would decide questions of arbitrability where parties' agreement stated that arbitration shall be held in accordance with the AAA's Commercial Arbitration Rules, stating: "We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

Even if the parties had not delegated to the arbitrator the issue as to the scope of the Arbitration Agreements, the broad language in the Arbitration Agreements would compel a finding that the disputes set out in the Complaint are arbitrable. Here, the inquiry is a simple one: Plaintiffs' misclassification claims are expressly covered by the Arbitration Agreements, which

require separate "binding arbitration" for "[a]ll claims, disputes, and controversies arising out of or in any manner relating to" their Distributor Agreements, including "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor . . . and claims for alleged unpaid compensation . .. under either federal or state law." *Agreements*, ¶¶ 1, 7.  The Agreements further provide that covered claims include any claims of any kind arising out of any association between Plaintiffs and Defendants (and not just claims arising directly from the Distributor Agreements) and include "tort claims, discrimination claims, retaliation claims, and claims for alleged unpaid compensation, civil penalties, or statutory penalties…" *Id.*  Therefore, there can be no question the claims asserted in this lawsuit are covered by the Arbitration Agreements.

      **C.**     **Under *Epic Systems*, Plaintiffs' Claims Must be Resolved in Separate Arbitrations.**

Plaintiffs must separately pursue their claims in arbitration.  The Arbitration Agreements expressly address this issue and provide:

> The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis ….
>
> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO:**
>
>     **(1)**    **INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION ….**

*Agreements* at ¶¶ 3, 4 (emphasis in original).  Pursuant to the plain terms of the Arbitration Agreements, the parties clearly agreed that any claims brought by Plaintiffs must proceed to arbitration on an individual basis.

The Supreme Court considered and resolved the issue of the enforceability of this type of waiver in arbitration agreements. In *Epic Systems Corporation vs. Lewis*, ___U.S.____, 138 S. Ct. 1612, 200 L.Ed. 2d 889 (2018), the Supreme Court held that Congress, when it enacted the FAA, was "instruct[ing] federal courts to enforce arbitration agreements according to their terms— including terms providing for individualized proceedings." *Id*. at 1619. Just as in *Epic Systems*, these Plaintiffs – after given ample opportunity to decide – signed Arbitration Agreements where they agreed in exchange for valuable consideration to waive their rights to pursue their claims in court or on a multi plaintiff basis. And, just as in *Epic Systems*, Plaintiffs improperly ignored their contractual obligations in seeking to jointly pursue these claims. Under *Epic Systems*, Plaintiffs are bound to resolve each of their disputes on an individual basis, as their Arbitration Agreements provide, and this Court should likewise enforce the policy liberally favoring enforcement of arbitration agreements by enforcing them as written.

### D. Plaintiffs Do Not Fit Into the Narrow "Transportation Workers" Exemption Found in § 1 of the FAA.

Despite the clear language of the Arbitration Agreements they signed, Plaintiffs may try to argue that their claims should not be compelled to arbitration because they are "transportation workers" exempt from the FAA under § 1. This argument lacks merit and was squarely rejected last year by the United States District Court, District of Connecticut in ***Bissonnette v. Lepage Bakeries Park St., LLC,*** 460 F.Supp.3d 191 (D.Conn. 2020)(holding that franchisees who had contracted with CK Sales are not transportation workers under the FAA, and therefore not subject to this narrow arbitration exemption).

Section 1 of the FAA provides an exemption for "contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9

U.S.C. § 1. Plaintiffs are obviously not railroad employees or seamen. The only remaining question, which the *Bissonnette* Court resolved last year, was whether franchisees such as Plaintiffs fall within the so-called "residual" clause for "any other class of workers engaged in foreign or interstate commerce." It is Plaintiffs' burden to prove that the FAA does not apply. *Gilmer*, 500 U.S. at 35. And, as set forth below, the residual clause is inapplicable, rendering enforcement of the Arbitration Agreements appropriate under the FAA.

The franchisees in *Bissonnette,* like Plaintiffs, characterized themselves as delivery drivers for baked goods. As such, they argued that they are akin to those intrastate drivers that courts have held fall within the FAA exemption simply because they deliver goods that have traveled at some point in interstate commerce. The court in *Bissonnette* re-soundly rejected Plaintiffs' characterization:

> Indeed, the Court does not take issue with these cases or with the general proposition that a delivery driver responsible for transporting goods that have traveled interstate may well be a "transportation worker" for purposes of the FAA. As one court has aptly observed, "[i]f there is one area of clear common ground among the federal courts to address this question, it is that truck drivers—that is, drivers actually involved in the interstate transportation of physical goods—have been found to be 'transportation workers' for purposes of the residuary exemption in Section 1 of the FAA." *Saxon v. Sw. Airlines Co.*, No. 19-CV-0403, 2019 WL 4958247, at *4 (N.D. Ill. Oct. 8, 2019), *appeal docketed*, No. 19-3226 (7th Cir. Nov. 7, 2019) (quoting *Kowalewski*, 590 F. Supp. 2d at 482–83). Here, however, the Plaintiffs' Distributor Agreements evidence a much broader scope of responsibility that belies the claim that they are only or even principally truck drivers. Rather, because the Plaintiffs purchase and own the territories comprising their routes, their distribution efforts are the means by which they realize and increase sales and profits for their franchise businesses. (*See* Linthicum Decl. ¶ 8.) Toward that end, the Distributor Agreements do not obligate Plaintiffs "to perform any services personally," such as driving; instead, they grant Plaintiffs latitude in managing their businesses, "including hiring employees at their discretion to run their businesses."[10] (*Id.*; *see also* Distributor Agreements § 16.2.) Plaintiffs are additionally responsible for not only obtaining and insuring their own delivery vehicles (Distributor Agreement § 9.1), but also:
>
> > identifying and engaging potential new customers; developing relationships with key customer contacts; ordering products based

> on customer needs; servicing the customers in their territory; stocking and replenishing product at the customer locations; removing stale product; and other activity necessary to promote sales, customer service, and otherwise operate their businesses.
>
> (Linthicum Decl. ¶ 8.) Plaintiffs are further required "to use their 'Best Efforts' to increase sales in their territories ... including by asking for displays, providing good customer service, recommending new products, soliciting new accounts, and effective merchandising, among other things." (*Id.*; *see also* Distributor Agreements § 5.1.)
>
> Defendants thus argue persuasively that Plaintiffs are "more akin to sales workers or managers who are generally responsible for all aspects of a bakery products distribution business" than they are to "traditional transportation workers like a long-haul trucker, railroad worker, or seaman."

***Bissonnette, supra***, at 199-200.

Other courts have similarly sought to determine the true nature of what it means to work in the transportation industry, interpreting it narrowly. In ***Hill v. Rent-A-Ctr., Inc.***, 398 F.3d 1286 (11th Cir. 2005), the Eleventh Circuit found that Rent-A-Center – a business that sells furniture and appliances to customers on a rent-to-own basis – was not in the transportation industry. ***Id.,*** at 1288-90. Instead, the court unsurprisingly found that Rent-A-Center was in the business of selling furniture – despite the fact that their business dealings caused employees to cross state lines. ***Id.*** As such, plaintiff "was not within the class of workers within the transportation industry." ***Id.*** In ***Veliz v. Cintas Corp.,*** 2004 WL 2452851, at *9 (N.D. Cal. 2004), ***modified on reconsideration on other grounds,*** 2005 WL 1048699 (N.D. Cal 2005), the court held that a sales service representative position that involved driving and delivering the defendant's products but also included "restocking supplies, and receiving orders or facilitating sales for more supplies," did not fall within Section 1's narrow transportation worker exception. As noted in ***Bissonnette,*** the court in ***Veliz,*** recognized that the "'job duties certainly entail driving but do not however entail delivery of product in the same manner that a truck driver does'" and therefore the job is more '"akin to

customer service than it is to a warehouse trucker, railroad employee or seamen.'" ***Bissonnette, supra,*** at 200, *quoting Veliz, supra,* at *10. In ***Tran v. Texan Lincoln Mercury, Inc.***, No. CIV.A. H-07-1815, 2007 WL 2471616 (S.D. Tex. Aug. 29, 2007), the Southern District of Texas provided perhaps the most cogent analysis of the issue, stating that "a transportation worker is someone who works in the transportation industry—an industry whose mission it is to move goods." ***Id***. at *5. In contrast, the court explained that "[Plaintiff] worked in the automobile industry—an industry whose mission it is to manufacture and sell automobiles …. His duties were not to transport goods on behalf of a carrier like a railroad or a vessel like a ship." ***Id.*** Rather, any transportation work was incidental to his primary responsibilities.

Under this reasoning, and consistent with the holding in ***Bissonnette, supra,*** Defendants are simply not transportation companies as contemplated under Section 1 of the FAA nor are Plaintiffs transportation workers. CK Sales, with whom Plaintiffs contracted, is in the business of contracting with distributors and Lepage is in the business of manufacturing bread and bakery products. ***Linthicum Decl.*** at ¶ 2. Lepage – like every other business – needs to get its products to customers, and one of the primary channels used by it to distribute bakery products is a network of independent distributors who contract with CK Sales to own and operate their own franchise businesses. ***Id.*** As with most businesses, Lepage's transportation function is incidental to the overall business. Plaintiffs do not – and cannot – claim Defendants are in the business of merely transporting goods like a trucking company, a railroad, or a fleet of ships, such that their alleged employment occurred in the transportation industry. Thus, they are not within a class of workers in the transportation industry and the residual clause does not apply.

> [T]he Court is mindful that the FAA exemption must be construed narrowly (citations omitted). To extend Section 1 of the FAA to those in Plaintiffs' shoes on the current record would do the precise opposite. The Court therefore holds that Plaintiffs are not transportation workers under FAA Section 1 and that they

accordingly must be compelled to arbitrate their claims pursuant to the Arbitration Agreement incorporated in their Distributor Agreements.

***Bissonnette, supra,*** at 201.

### E. Plaintiffs' Claim for Fraud/Misrepresentation Has No Impact On Their Obligation To Arbitrate.

Plaintiffs have alleged fraud/misrepresentation (Count VI) with regard to alleged representations made by one or more Defendants regarding the potential for Plaintiffs' business to earn profits and the need for Plaintiffs to purchase a minimum of three territories. "[C]ourts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms…" ***Francisco J. Ortiz & Co., Inc. v. Masco Corporation of Indiana,*** 147 F.Supp. 3d 1, 3 (D. P.R. 2015) ***quoting Granite Rock Co. v. Int'l Bhd. of Teamsters,*** 561 U.S. 287, 301, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010). "In a validity challenge based on fraud…even where…the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of the contract…the basis of challenge [must] be directed specifically to the agreement to arbitrate before the court will intervene." ***Id.*** "A challenge to the validity of the contract as a whole…must go to the arbitrator." ***Buckeye Check Cashing, Inc. v. Cardegna,*** 546 U.S. 440, 448-49, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). In accordance with the case law, Plaintiffs' claim for fraud/misrepresentation has no bearing on their obligation to arbitrate their disputes.

### IV. Conclusion

Defendants respectfully request that the Court dismiss this lawsuit and/or stay it and compel Plaintiffs to separately arbitrate their claims pursuant to the Arbitration Agreements they signed. Defendants also request such other and further relief to which they may be entitled.

Dated: August 13, 2021

Respectfully submitted,

Flowers Foods, Inc., Lepage Bakeries Park Street, LLC and CK Sales Co., LLC,

By their attorneys,

 /s/ Frederick B. Finberg
Frederick B. Finberg, Esquire
rfinberg@thebennettlawfirm.com
Peter Bennett, Esquire
pbennett@thebennettlawfirm.com
Pawel Z. Binczyk, Esquire
pbinczyk@thebennettlawfirm.com
THE BENNETT LAW FIRM, P.A.
75 Market Street, Suite 201
Portland, ME  04101
(207) 773-4775

## CERTIFICATE OF SERVICE

I, Frederick B. Finberg, hereby certify that on August 13, 2021, I filed the foregoing via the Court's CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF) to all counsel of record.

 /s/ Frederick B. Finberg
Frederick B. Finberg