UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARITO V. CANALES and<br>BENJAMIN J. BARDZIK,<br><br>Plaintiffs,<br><br>v.<br><br>LEPAGE BAKERIES PARK STREET LLC,<br>CK SALES CO., LLC, and FLOWERS<br>FOODS, INC.,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*   Civil Action No. 1:21-cv-40065-ADB<br>*<br>*<br>*<br>*<br>*<br>* |

## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION
## TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION

Margarito V. Canales ("Canales") and Benjamin J. Bardzik ("Bardzik," collectively, "Plaintiffs") brought this action against Lepage Bakeries Park Street, LLC ("Lepage"), CK Sales Co., LLC ("CK Sales"), and Flowers Foods, Inc. (together with Lepage and CK Sales, "Defendants"), alleging that Defendants deliberately misclassified them as independent contractors in violation of Massachusetts law and thereby withheld wages and overtime compensation.  See [ECF No. 1 ("Compl.")].  Currently before the Court is Defendants' motion to dismiss, or, in the alternative, compel arbitration pursuant to the Federal Arbitration Act ("FAA").  [ECF No. 9].  For the reasons set forth below, the motion is DENIED with leave to file a renewed motion to dismiss.

I.      BACKGROUND

      A.      **Factual Background**

The Court draws the following facts from the complaint and the materials filed in connection with Defendants' motion to dismiss or compel arbitration.  See Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018).

Defendants manufacture, sell, and distribute baked goods throughout Massachusetts. [Compl. ¶¶ 8–9; ECF No. 10-1 ¶¶ 2–4].  To carry out their operations, Defendants use a "direct-store-delivery" system in which "independent distributors" purchase distribution rights to deliver products and stock shelves at stores along particular routes.  [Compl. ¶¶ 9, 11; ECF No. 10-1 ¶ 3].  Defendants classify these individuals as independent contractors.  [Compl. ¶ 11].

Prior to April 2018, Plaintiffs worked as delivery drivers for Defendants.  [Compl. ¶ 12]. In late 2017, Defendants' representatives approached Plaintiffs and told them that their delivery route would be purchased soon.  [Id. ¶ 14].  Plaintiffs were under the impression that they would be terminated unless they purchased the route themselves and became independent distributors. [Id. ¶ 15].  According to Plaintiffs, Defendants falsely told them that Massachusetts law required them to purchase distribution rights for a minimum of three territories in order to become independent distributors.  [Id. ¶¶ 16–17].

In June 2018, Plaintiffs, through their distribution company, T&B Dough Boys Inc. ("T&B"),[1] signed a contract with Defendants ("Distributor Agreement"), [ECF No. 10-3 (copy of Distributor Agreement)], to purchase the distribution rights for three routes, [Compl.¶ 21; ECF No. 10-1 ¶ 5].  The Distributor Agreement incorporates a separate exhibit requiring T&B,

---

[1] Plaintiffs formed T&B in 2018.  [ECF No. 10-2 at 7].  Canales owns 51% of T&B, and Bardzik owns 49%.  [Id. at 5].

including its owners, to arbitrate disputes with Defendants arising out of their business relationship (the "Arbitration Agreement"). [ECF No. 10-3 at 27–29]. The Arbitration Agreement states that:

> [t]he parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR (including its owner or owners) may have against COMPANY (and/or its affiliated companies and its and/or their directors, officers, managers, employees, and agents and their successors and assigns) or that COMPANY may have against DISTRIBUTOR (or its owners, directors, officers, managers, employees, and agents), arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY ("Agreement"), including the termination of the Agreement, services provided to COMPANY by DISTRIBUTOR, or any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein.

[ECF No. 10-3 at 27]. The Arbitration Agreement also states that "[a]ll Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action." [Id.]. The "Covered Claims" that must be submitted to arbitration include "any claims challenging the independent contractor status of DISTRIBUTOR" and "claims alleging that DISTRIBUTOR was misclassified as an independent contractor." [Id. at 28]. Finally, the Arbitration Agreement includes a delegation clause that provides that "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court." [Id.]. Although the Distributor Agreement is signed on behalf of T&B, Canales and Bardzik each also signed a Personal Guaranty, [ECF No. 10-3 at

25–26], certifying that each of them, as individuals, "agrees and acknowledges he/she is subject to" the Arbitration Agreement in the Distributor Agreement, [ECF No. 10 at 3–4; ECF No. 10-3 at 25–26].  In July 2019, Plaintiffs, through T&B, purchased a fourth distribution route, T&B signed another Distributor Agreement (with an identical Arbitration Agreement), and Plaintiffs submitted a business plan in connection with that purchase.  [ECF No. 10-1 ¶ 7; ECF No. 10-4; ECF No. 10-5].  In October 2020, Plaintiffs arranged for CK Sales to buy back the fourth territory they purchased in July 2019 and then purchased a different territory.  [ECF No. 10-1 ¶ 5].  In connection with that purchase, T&B again signed another Distributor Agreement with an Arbitration Agreement and submitted another business plan.  [ECF Nos. 10-6, 10-7].

  Since signing the Distributor Agreements, Plaintiffs represent that they have worked an average of sixty to eighty hours a week but have not been properly compensated and have been forced to pay various expenses, including delivery driver payments, delivery truck payments, insurance payments, gas and maintenance, "shrink charges" for missing or damaged goods, and "stale charges" for baked goods that have been returned as stale.  [Compl. ¶¶ 23–28; ECF No. 19 ¶¶ 4, 6; ECF No. 20 ¶¶ 4, 6].  Plaintiffs also aver that they spend a minimum of fifty hours per week driving on two delivery routes and another twenty to thirty hours supervising other drivers who work their other delivery routes.  [ECF No. 19 ¶¶ 4–6; ECF No. 20 ¶¶ 4–6].  Though Plaintiffs state that they spend the vast majority of their time driving or supervising drivers, the Distributor Agreements do not require the Plaintiffs to perform any driving themselves.  [ECF No. 10-3 at 16 ("This [Distributor] Agreement does not require that DISTRIBUTOR'S obligations hereunder be conducted personally" by Plaintiffs or any specific individual)].  A declaration from a LePage employee describes Plaintiffs as having significant other responsibilities beyond driving, including "hiring employees at their discretion to run their four

4

territories; identifying and engaging potential new customers; developing relationships with key customer contacts; ordering products based on customer needs; servicing the customers in their territory, stocking and replenishing product at the customer locations; removing stale product; and other activity necessary to promote sales, customer service and otherwise operate their independent business." [ECF No. 10-1 ¶ 10].

### B. Procedural Background

Plaintiffs filed their eight-count complaint on June 17, 2021, alleging violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149 §§ 148, 148B; the Massachusetts Minimum Fair Wage Law, Mass. Gen. Laws ch. 151 §§ 1, 1A; unjust enrichment; fraud/misrepresentation; breach of contract; and breach of the implied covenant of good faith and fair dealing. [Compl. ¶¶ 40–59]. On August 13, 2021, Defendants filed a motion to dismiss, or, in the alternative, to compel arbitration pursuant to the FAA, [ECF No. 9], which Plaintiffs opposed on September 10, 2021, [ECF No. 16]. Plaintiffs moved to supplement the record on September 29, 2021 and then filed supplemental affidavits regarding the nature of their work for Defendants. [ECF Nos. 17, 19, 20]. Defendants replied to Plaintiffs' supplemental materials on October 5, 2021. [ECF No. 24].

## II. LEGAL STANDARD

The FAA "'embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.'" Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)). According to the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2.  The party that seeks to compel arbitration is the one that bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement."  Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)).

## III.  DISCUSSION

Plaintiffs argue that they cannot be compelled to arbitrate because they qualify as transportation workers under § 1 of the FAA and are therefore exempt from the statute.[2]  [ECF No. 16 at 14–16; ECF No. 17].  Here, the Arbitration Agreement explicitly reserves the question of the FAA's applicability for the courts, not an arbitrator.  [ECF No. 10-3 at 27].  Thus, it falls to this Court to decide whether Plaintiffs qualify as transportation workers under § 1.

### A.  Scope of the § 1 Exemption

Section 1 of the FAA states that the statute does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1; see Waithaka v. Amazon.com, Inc., 966 F.3d 10, 26 (1st Cir. 2020), cert. denied, 141 S. Ct. 2794 (2021), reh'g denied, 141 S. Ct. 2886 (2021).  In Circuit City Stores, Inc. v. Adams, the Supreme Court narrowly interpreted the phrase "any other class of workers engaged in foreign or interstate commerce" and limited its coverage to "transportation workers" engaged in foreign or intrastate commerce.  532 U.S. 105, 114, 119 (2001) ("Section 1 exempts from the FAA only contracts of employment of transportation workers.").  The Court's

---

[2] Although Plaintiffs make several other arguments in opposition to the motion to dismiss, [ECF No. 16 at 4–14], because the § 1 issue is dispositive for the purposes of Defendants' pending motion, the Court begins and ends its discussion with an analysis of § 1.

6

analysis was guided by the canon of *ejusdem generis*, which required the Court to read "the residual clause . . . to give effect to the terms 'seamen' and 'railroad employees'. . ." Id. at 115. Notably, other than determining that the exemption applied only to seamen, railroad employees, and transportation workers, the Supreme Court declined to provide further guidance on which type of workers would fall within § 1.

Although the Supreme Court has provided scant guidance on how courts should define "transportation worker," the First Circuit has recently interpreted the term in the context of last-mile delivery drivers for Amazon. Waithaka, 966 F.3d at 26. In Waithaka v. Amazon.com, Inc., the First Circuit held that "last-mile delivery workers who haul goods on the final legs of interstate journeys" while employed by Amazon "are transportation workers 'engaged in . . . interstate commerce.'" Id. The First Circuit concluded that the § 1 exemption applied to these workers, "regardless of whether the workers themselves physically cross state lines" because the goods they were delivering had moved interstate. Id.; see also Immediato v. Postmates, Inc., No. 20-cv-12308, 2021 WL 828381 (D. Mass. Mar. 4, 2021) ("It is the goods, and not the workers, that define engagement in interstate commerce."). Due to the facts of the case before it, the First Circuit limited its analysis to workers that spent their time physically transporting goods for Amazon. Waithaka, 966 F.3d at 22 n.10. Although the First Circuit declined to explicitly define the boundaries of § 1, it noted that the exemption is not necessarily limited to workers that actually transport goods and opined "that the contracts of workers 'practically a part' of interstate transportation—such as workers sorting goods in warehouses during their interstate journeys or servicing cars or trucks used to make deliveries—[do not] necessarily fall outside the scope of the Section 1 exemption." Id. at 20 n.9. The First Circuit recognized precedent from the Third Circuit that "described Section 1 as covering workers 'who are actually engaged in the

7

movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it.'" Id. (quoting Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Loc. 437, 207 F.2d 450, 452 (3d Cir. 1953)); see also Palcko v. Airborne Express, Inc., 372 F.3d 588, 593 (3d Cir. 2004) (finding that a worker who directly supervised package shipments was exempt under § 1 even though the worker did not personally transport packages); Saxon v. Sw. Airlines Co., 993 F.3d 492, 497 (7th Cir. 2021), cert. granted, 142 S. Ct. 638 (2021) (holding that ramp manager that assisted with loading and unloading passengers and cargo for airline fell within the § 1 exemption).

Although the First Circuit declined to further examine which workers may be "so closely related" to interstate commerce as to practically be a part of it, another court in this district recently considered that precise question. Fraga v. Premium Retail Servs., Inc., No. 21-cv-10751, 2022 WL 279847, at *7 (D. Mass. Jan. 31, 2022), appeal docketed No. 22-1130 (1st Cir. Feb. 10, 2022). After undertaking a thorough study of the statutory language and applicable case law from this and other circuits, that court concluded that § 1's residual clause should be read

> to include those "so closely related [to interstate transportation] as to be in practical effect part of it." See Tenney, 207 F.2d at 452 (emphasis added); Saxon, 993 F.3d at 494; Patterson, 113 F.3d at 836. This framework allows workers engaged in interstate commerce to be broken down into three categories: 1) "workers who themselves carried goods across state lines"; 2) "those who transported goods or passengers that were moving interstate"; and 3) those "in positions so closely related to interstate transportation as to be practically a part of it." See Waithaka, 966 F.3d at 20 (internal quotation marks omitted).

Id.  Of particular significance in Fraga v. Premium Retail Services, Inc. was the language of the Federal Employer's Liability Act, which includes "nearly identical language to Section 1 of the FAA" and has been construed by the Supreme Court to include "'employees engaged in interstate transportation or in work so closely related to it as to be practically a part of it.'" Id. at *6 (quoting Shanks v. Del., Lackawanna & W.R.R., 239 U.S. 556, 558–59 (1916) (emphasis

8

omitted)).  This Court agrees with the Fraga court's well-reasoned interpretation of § 1, as well as the views of other circuits, and likewise finds that workers engaged in activities so closely related to interstate commerce as to practically be a part of it are also transportation workers under § 1.  See Palcko, 372 F.3d at 593; Saxon, 993 F.3d at 497.

After analyzing the scope of the exemption, the Fraga court determined that the plaintiff, who had the official job title of "Merchandiser," was so closely related to interstate commerce as to be a part of it.  2022 WL 279847 at *9.  The defendant in that case operated a business that supported various retail customers by providing product displays, "point-of-purchase" displays, pricing, and signage for use in its customers' stores.  Id. at *2.  Despite her official job title, the court looked to the plaintiff's actual responsibilities, which included receiving "point-of-purchase" display materials that had traveled in interstate commerce, searching through and sorting those materials, and then transporting the displays to different stores.  Id. at *8.  The court concluded that the plaintiff "served as an integral part of delivering the goods to their end destination. This is the essence of handling goods that travel interstate."  Id.  In addition to these delivery responsibilities, the plaintiff's other responsibilities included auditing and stocking products, assembling the displays, and updating product pricing and signage.  Id. at *2.  The court did not find that the plaintiff's other responsibilities removed her from §1's scope.  Id. at *9 ("While her work entails providing a service, she transports the goods used in that service, which were previously travelling interstate.").

### B.  Applicability to this Case

Having determined the scope of § 1, the Court next applies it to the facts of this case and concludes that Plaintiffs fall under the exemption and cannot be compelled to arbitrate their claims pursuant to the FAA.

Plaintiffs contend that their duties are "entirely consistent with the work performed by the plaintiffs in Waithaka" because the work they "engage in daily consists of transporting goods in the stream of interstate commerce." [ECF No. 16 at 15]. Defendants push back on this interpretation and argue that Plaintiffs are not delivery drivers and are instead "independent distributor franchisees" whose main responsibilities are customer service and growing the business, rather than transporting goods. [ECF No. 10 at 1, 14–15; ECF No. 24 at 3–5].

Plaintiffs' job title alone is not dispositive because "[i]t is not the title of the worker, however, that is the key focus of the analysis but rather the actual activities performed." Fraga, 2022 WL 279847, at *5 (citing Waithaka, 966 F.3d at 22). Plaintiffs have each submitted a supplemental affidavit in which they swear "under the pains and penalties of perjury" that their work for Defendants "has consisted and still consists primarily of driving trucks delivering the Defendants' bread products from their warehouse to their customers along particular delivery routes," they "spend a minimum of [fifty] hours per week driving," and the remaining twenty to thirty hours of work per week consists of "supervising other individuals who drive trucks." [ECF No. 19 ¶¶ 2, 4–6; ECF No. 20 ¶¶ 2, 4–6]. Defendants argue that these affidavits should be given little, if any, weight since they do not account for, and ultimately contradict, the non-delivery responsibilities outlined in the Distributor Agreements and business plans, which include developing relationships with customers, hiring other drivers, and improving sales. [ECF No. 24 at 3–5]. Defendants also point to the fact that the Distributor Agreements explicitly do not require Plaintiffs to continue making the deliveries themselves. [ECF No. 10 at 14]. Importantly, Defendants do not assert that Plaintiffs never spend any time physically making deliveries but instead argue that they are not "primarily drivers" and the amount of time they spend driving is insufficient to push them into the § 1 exemption. [ECF No. 24 at 3, 5 ("It is

clear from [the LePage employee's] Declaration and Plaintiffs' own business plans that less than half of their time is devoted to driving and that driving is **incidental** to all of their other responsibilities. . . .") (emphasis in original)]. Further, Defendants do not challenge Plaintiffs' representation that the baked goods crossed state lines before arriving to Defendants' customers.[3] [ECF No. 19 ¶ 10; ECF No. 20 ¶ 10].

     Defendants' argument that the Distributor Agreements and business plans are proof that Plaintiffs did not primarily engage in driving is unavailing. Plaintiffs have put forth sworn affidavits stating that they spend the majority of their time making deliveries. And, although the Distributor Agreements do not require Plaintiffs to personally drive trucks or deliver goods, they also do not prohibit such activities, and there is nothing in the record to suggest that Plaintiffs were carrying out all of the other responsibilities included in the Distributor Agreements and business plans, or that those other responsibilities took up more time than driving. Defendants also have not pointed to any binding case law that requires a worker to be transporting goods at all times in order to be considered a "transportation worker." Cf. Saxon, 993 F.3d at 494 (noting that "[o]stensibly [plainitff's] job is meant to be purely supervisory," but still finding that she was a transportation worker because her declaration stated that she would fill in as a ramp agent when the company was short on workers); Fraga, 2022 WL 279847, at *9 (recognizing that plaintiff had responsibilities other than delivering goods). Thus, taking Plaintiffs' statements that they spend over fifty hours a week delivering goods as true, Plaintiffs' responsibilities are essentially identical to the Waithaka delivery drivers' responsibilities and, under that binding precedent, clearly fall within the § 1 exemption.

---

[3] Plaintiffs do not assert that they ever had to physically cross state lines to carry out their responsibilities.

Even assuming that Plaintiffs' work primarily involves supervising other drivers and engaging in tasks that only relate to delivery of the interstate goods rather than actually performing the deliveries themselves, those activities are still so closely related to interstate commerce that Plaintiffs are practically a part of it.  Although the First Circuit did not expressly address the "so closely related" question, it noted that "so closely related" workers could include "workers sorting goods in warehouses during their interstate journeys or servicing cars or trucks used to make deliveries."  Waithaka at 20 n.9.  In Palko v. Airborne Express, Inc., the Third Circuit held that the plaintiff, who was responsible for monitoring the improvement of drivers and ensuring timely and efficient package delivery, was so closely related to interstate commerce as to be a part of it and declined to limit § 1 to only those "truck drivers who physically move the packages."  372 F.3d at 593.  Here, Plaintiffs' other responsibilities include hiring and supervising other drivers, building relationships with potential delivery customers, ordering products based on customer needs, making sure the products are properly stocked and not stale, and otherwise servicing the customers in their territory.  These responsibilities, which generally require overseeing deliveries or ensuring that the delivered goods are in proper condition, are sufficiently similar to the hypothetical examples in Waithaka and the supervisor in Palko to support the conclusion that Plaintiffs are transportation workers.

Defendants urge this Court to adopt the reasoning and holding of Bissonnette v. Lepage Bakeries Park St., LLC, 460 F. Supp. 3d 191 (D. Conn. 2020), which they argue is directly on point.  [ECF No. 10 at 13–17; ECF No. 24].  In Bissonnette, another group of Defendants' employees filed suit alleging violations of various employment laws.  460 F. Supp. 3d at 193.  Those employees, like Plaintiffs here, were also "franchisees" and had signed distributor agreements.  Id. at 194.  In that case, the district court dismissed the case in favor of arbitration

because the "Distributor Agreements evidence a much broader scope of responsibility [beyond delivering goods] that belies the claim that they are only or even principally truck drivers." Id. at 199. Bissonnette is distinguishable on two grounds. First, it does not appear that the Bissonnette court had sworn affidavits from the plaintiffs attesting that they spent fifty hours a week driving and making deliveries. Second, the Bissonnette court also did not meaningfully consider whether the non-driving responsibilities would result in the plaintiffs being so closely related to interstate commerce as to practically be a part of it. Id. at 202 (noting only that "[t]he fact that Plaintiffs' contracts expressly contemplate delegation of delivery work and all manner of Plaintiffs' business operations, moreover, undercuts the suggestion that Plaintiffs are personally indispensable to the flow of goods in a manner akin to a traditional truck driver, or that Plaintiffs are so closely related to interstate commerce as to be part of it." ). Accordingly, Bissonnette does not require this Court to dismiss or compel arbitration.

Defendants argue, in a final effort to overcome the § 1 exemption, that transportation is only incidental to their business because LePage is a bread baking company, and CK Sales is a company that is in the business of contracting with distributors. [ECF No. 10 at 16]. Therefore, according to Defendants, they are clearly distinct from a railroad operator, airline, or trucking company. [Id.]. Defendants fail to point to any binding case law that requires an employer to be a transportation company for § 1 to apply. To the contrary, the First Circuit, after describing Amazon as an "online retailer," rather than a trucking or transportation company, still found that its delivery drivers were transportation workers. Waithaka, 966 F.3d at 14, 26. Other courts have reached similar conclusions. See Saxon, 993 F.3d at 497 (noting that "a transportation worker need not work for a transportation company"); Fraga, 2022 WL 279847, at *5 ("It is not required that a class of workers be employed by an interstate transportation business nor a

business of a certain geographic scope to fall within Section 1." (internal quotation marks and citations omitted)). Therefore, the nature of Defendants' business alone does not mandate dismissal or compel arbitration.

In sum, Plaintiffs are transportation workers within the meaning of §1 and are exempt from the FAA. Therefore, Defendants' motion to dismiss, or, in the alternative, to compel arbitration pursuant to the FAA, is <u>DENIED</u>.

### C.   State Arbitration Law

Although the FAA does not require dismissal, the Court must still determine if arbitration can be compelled under state law. <u>Waithaka</u>, 966 F.3d at 26. The text of the Arbitration Agreement indicates, and the parties appear to agree, that Massachusetts arbitration law would apply if the FAA did not. [ECF No. 10-3 at 29 ("This Arbitration Agreement shall be governed by the FAA and []<u>Massachusetts</u> law to the extent <u>Massachusetts</u> law is not inconsistent with the FAA."); ECF No. 10 at 9; ECF No. 16 at 11]. Here, it is undisputed that the Arbitration Agreement waives any rights to proceed in a class action or multi-plaintiff suit and also specifically delegates an analysis of that wavier to the Court, not an arbitrator. [ECF No. 10-3 at 28–29]. After analyzing the relevant Massachusetts case law, the First Circuit in <u>Waithaka</u> held that "[the Massachusetts Supreme Judicial Court] would conclude that the right to pursue class relief in the employment context represents the fundamental public policy of the Commonwealth, such that this right cannot be contractually waived in an agreement not covered by the FAA." 966 F.3d at 29–33. Thus, "where the FAA does not control, class action waivers are void <u>ab initio</u> as matter of public policy in Massachusetts." <u>Fraga</u>, 2022 WL 279847, at *10. Accordingly, it appears that Massachusetts law would also not compel arbitration in this multi-plaintiff suit. Although this issue must be resolved, other than Plaintiffs' one-paragraph

argument that Massachusetts law would prohibit arbitration, neither party has comprehensively briefed this issue. [ECF No. 16 at 11 ("The arbitration provision's waiver of rights to proceed on a 'multi-plaintiff basis' violates Massachusetts law.")]. Because this is an important issue that would benefit from additional briefing, the Court allows Defendants leave to file a renewed motion to dismiss that solely addresses the issue of arbitration under state law.[4]

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs are exempt from the FAA and cannot be compelled to arbitrate pursuant to that statute, but as noted above, the issue of state arbitration law remains. Accordingly, Defendants' motion to dismiss, or, in the alternative, to compel arbitration pursuant to the FAA, [ECF No. 9], is DENIED. Within fourteen (14) days of the date of this Order, Defendants should file a renewed motion to dismiss only addressing the specific

---

[4] Because the Court's resolution of the § 1 exemption issue is sufficient to resolve Defendants' pending motion, the Court has not analyzed Plaintiff's additional arguments that the Distributor Agreements (and consequently the Arbitration Agreements) are otherwise invalid or that Plaintiffs are not even parties to the Distributor Agreements. Although the Court reserves judgment on these issues at this time, it notes that other than the FAA's applicability and the waiver of class action rights, the Arbitration Agreement expressly delegates "[a]ny issues concerning arbitrability of a particular issue or claim" to an arbitrator and adopts the American Arbitration Association's rules, which provide that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." American Arbitration Association, Commercial Rules and Mediation Procedures, Rule 7(a) (2013). Although the Supreme Court has cautioned that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so[,]" First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (second and third alterations in original) (internal quotation marks omitted) (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)), it has also recently held that courts must respect delegations of arbitrability, Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019); see also Boursiquot v. United Healthcare Servs. of Delaware, Inc., 158 N.E.3d 78, 83 (Mass. App. Ct. 2020) (analyzing delegation clauses under Massachusetts law). Here, Plaintiffs have failed to meaningfully grapple with the Arbitration Agreement's delegation provisions when advancing their other arguments in opposition to dismissal.

issue of state arbitration law or a status report indicating that they will not file another motion to dismiss.

**SO ORDERED.**

March 30, 2022                                                                 /s/ Allison D. Burroughs
                                                                                      ALLISON D. BURROUGHS
                                                                                      U.S. DISTRICT JUDGE