**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

MARGARITO V. CANALES and
BENJAMIN J. BARDZIK,

        Plaintiffs,

v.

LEPAGE BAKERIES PARK STREET LLC,
CK SALES CO., LLC, and FLOWERS
FOODS, INC.,

        Defendants.

Civil Action No. 1:21-cv-40065-ADB

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants file this Reply Memorandum of Law in Support of their Motion for Summary Judgment on the four remaining counts in Plaintiffs' Complaint. Plaintiffs attempt to create factual disputes on key issues where none exist and mischaracterize and/or  misapply the law.[1]

## I.      <u>ARGUMENT</u>

**A.      Plaintiffs Do Not "Perform Any Service" for Defendants Simply Because Lepage Derives Revenue Through the Sale of Products to T&B**

Though Plaintiffs generate quite a bit of dust relating to direction and control relative to retail customers, they put the cart before the horse as those issues relate to the misclassification test set out in *Section 148B* and <u>not</u> the threshold issue as to whether Plaintiffs provide a service to one of the Defendants or T&B. Plaintiffs ask this Court to ignore the legal implications of their ownership of T&B, a very profitable multi-territory, multi-employee incorporated franchisee. Plaintiffs also ask this Court to overlook the fact that T&B, and not Plaintiffs, is the franchisee.

---

[1] Many of the statements set out in Plaintiff's' Statement of Additional Facts are not material.

B0151328.10

By Plaintiffs' own admission, T&B employs Plaintiffs and others, pays them wages, which it reports on IRS Form W-2, issues them substantial profit distributions, and determines the extent to which they perform services for T&B. It remains undisputed that Defendants do not compensate Plaintiffs, and that Plaintiffs in their sole and uncontestable discretion decide how much T&B pays each of them in exchange for *their services* to T&B as well as how much T&B pays its other employees. Plaintiffs admit, as they must, that Defendants make no decisions, nor have any input, regarding how T&B compensates Plaintiffs for the services they provide to T&B. ***See [ECF 58]*** SOMF ¶¶ 49-50, 61, 64, 66, and 69.

Plaintiffs mischaracterize the undisputed financial arrangement T&B has with CK Sales and Lepage and as such, Plaintiffs misplace reliance on ***Sebago v. Bos. Cab Dispatch, Inc.***, 471 Mass. 321, 329 (Mass. 2015). As is common in franchisor/franchisee relationships, T&B purchases product from Lepage which it resells to customers located in the territories for which it owns distribution rights. The distinction drawn from ***Sebago*** was that "[t]he revenue flowing to the radio association through the voucher program was directly dependent on the drivers' work of transporting passengers … the salient facts upon which we relied in making the threshold determination were that the drivers did the work of driving the associations' clients and in turn were paid therefor by the associations." ***Patel***, 494 Mass. at 573 (***citing Sebago***, 471 Mass. at 331). Here, there simply is no comparable flow of revenue to Defendants from Plaintiffs' labor. Lepage bakes bread and sells the bread at a wholesale price to distributor franchisees like T&B. ***[ECF 58]*** SOMF ¶¶ 25 and 27. T&B employs several individuals who sell and distribute to T&B's customers the bread it buys from Lepage. Plaintiffs acknowledge they perform work for T&B along with other T&B employees and receive their compensation from T&B. ***Id***. at ¶¶ 49-50 and 52. This T&B fact pattern is far more akin to ***Patel*** where, as part of their acquisition of a 7-Eleven license,

the plaintiff-franchisees agreed to "buy particular inventory from particular vendors" and were "required to stock a reasonable and representative quantity of 7-Eleven proprietary products." *Patel*, 494 Mass. at 576. Revenues generated from the plaintiff-franchisees' sale of said products were deposited into a 7-Eleven controlled bank account, where a 7-Eleven Charge was paid and the plaintiff-franchisees accessed the balance profits via a withdrawal election.

The fact that distributor franchisees authorize CK Sales and/or its agents, per the Distributor Agreement Settlement Statement Authorization, to collect payments on their behalf and remit to distributor franchisees has no bearing on the threshold issue whether Plaintiffs provide a service to T&B or Defendants. Unlike in *Sebago*, Plaintiffs do not receive any payments from any of the Defendants and the revenue Plaintiffs' company, T&B, generates as a franchisee is not simply passed through to Defendants. Rather, much like the facts in *Patel*, T&B is an independent business and from the revenue it generates, T&B not only pays Plaintiffs wages and profits but also pays its other employees and covers its other costs. *[ECF 58-10]* Business Plan 7876. T&B has maintained all corporate formalities, and has held itself out as and conducted itself as an independent business, generating substantial profits for the benefit of Plaintiffs, its shareholders. Despite these facts and without any legal support, Plaintiffs argue that this Court should conclude that T&B is a corporate fiction. However, Plaintiffs fail to identify record evidence or legal principles in support of this argument.

Plaintiffs also distort the issue of "service" by completely ignoring undisputed facts. T&B owns and operates four territories, a fleet of trucks, and has employed five individuals for whom it has issued IRS Form W-2. *See Cook v. Estes Express Lines Corp.*, 2018 WL 1773742 (D.Mass. April 12, 2018). In *Cook,* the court held that plaintiff's company and defendants entered into a legitimate business-to-business relationship. The work performed by the corporate entity owned

by plaintiff "involved far more" than plaintiff's "personal services." *Id.* at *2. It involved the corporate entity's employment of multiple employees and ownership of multiple trucks. In addition, plaintiff, as owner, netted more than twice as much in income than the non-owner employees. *See also Debnam v. FedEx Home Delivery*, 2013 WL 5434142, at *1 (D. Mass. Sept. 27. 2013) (plaintiff's extensive entrepreneurial activities precluded the application of *Section 148B*.) In *Debnam,* plaintiff's business simultaneously operated multiple routes with multiple employees and ownership of multiple vehicles. Further, plaintiff filed business tax returns which disclosed substantial business income. *Id*. Similarly here, Plaintiffs' company, T&B, operated five different territories (four at the same time), employed five individuals, owns a fleet of trucks, files business tax returns and all as part of two detailed written business plans Plaintiff Canales developed for T&B. *[ECF 58-10 and ECF 58-11]* Business Plans for 7876 and 7974. In short, T&B and CK Sales entered into a legitimate arm's length business-to-business relationship.

Finally, this Court should disregard Plaintiffs' argument that having direct access to the general public should be dispositive regarding the issue of "service", as neither the holding in *Patel* nor in *Sebago* hinged on whether a party "served the general public" or had "direct interaction" with the "general public," or both. The argument is a distraction and has no bearing on whether Plaintiffs can satisfy the threshold issue as to whether Plaintiffs provide a service to T&B.

**B.**     **Defendants Did Not Make Any Deductions from Plaintiffs' Wages, Entitling Defendants to Summary Judgment on Count II**

Cognizant of the square peg round hole conundrum that is the unlawful wage deductions claim, Plaintiffs attempt to slip the claim past summary judgment by arguing that it would be "premature[]" for this Court to rule on summary judgment because the claim "depends" on the misclassification claim, and damages for the two claims "may overlap." Plaintiffs' plea to delay summary judgment has no basis in law. Certainly, Counts II-IV must be dismissed as a matter of

law if Plaintiffs' misclassification claim (Count I) fails. However, the reverse does not hold true. Even if Plaintiffs' misclassification claim survives summary judgment, neither the unlawful deductions claim (Count II), nor the other remaining claims automatically survive summary judgment. If Plaintiffs' misclassification claim survives, to avoid summary judgment on the remaining three claims, including the claim for unlawful deductions, Plaintiffs must still identify genuine issues of material fact that would justify a trial. Plaintiffs fail to do so.

Plaintiffs argue that the financial arrangement between T&B and CK Sales and Lepage, as reflected in the Settlement Statements, somehow reflects wages paid to Plaintiffs. They do not provide any legal support for this argument to counter the undisputed facts that the Settlement Statements merely reflect debits and credits flowing between T&B and Lepage and, that T&B pays wages to Plaintiffs and others on whatever basis Plaintiffs determine from the revenue T&B generates. None of the Defendants pay any wages to Plaintiffs and therefore Defendants cannot be held to have made unlawful deductions from wages.

Even assuming *arguendo,* the Settlement Statements somehow reflect the payment of wages, Plaintiffs fail to explain why these supposed "wages," generated through the work of all of T&B's employees and not just the work of Plaintiffs, should be allocated entirely to Plaintiffs as their wages. *[ECF 58-28]* Margarito Canales' Supplemental Answers to Defendants' First Set of Interrogatories at Interrogatory No. 4; *[ECF 58-29]* Benjamin Bardzik's Supplemental Answers to Defendants' First Set of Interrogatories at Interrogatory No. 4.[2] They further fail to explain why all of the expenses reflected in the Settlement Statements should be deemed deductions from

---

[2] Plaintiffs chose to deduct the wages of one T&B employee for purposes of calculating their damages for Count II, but in an effort to increase their damages, they conveniently opted not to do so for Counts III and IV.

Plaintiffs' wages rather than from the wages of other employees T&B paid. *Id.*[3] The law does not permit Plaintiffs to create their own regulatory scheme as to what constitutes wages and deductions and how they should be allocated.

Finally, if for the sake of discussion only, the Settlement Statements are deemed not only to reflect the payment of wages but only the payment of wages to Plaintiffs and not payment to any of T&B's other employees, then Plaintiffs must identify legal support for their argument that the expenses reflected in the Settlement Statements somehow constitute deductions from wages paid to Plaintiffs, rather than an element of a commission formula. None of the cases that Plaintiffs cite address this particular issue. Instead, Plaintiffs claim without authority that the Settlement Statements cannot reflect a commission formula because "the payments to the Plaintiffs are first calculated based simply on sales" and "only" later do Defendants deduct specific items listed under "Business Expenses." Plaintiffs' criticism misses the mark.

Commissions qualify as wages, when "two conditions [have been] met: (1) the amount of the commission 'has been definitely determined' and (2) the commission 'has become due and payable.'" *See Klauber v. VMware, Inc.*, 80 F.4th 1, 10-11 (1st Cir. 2023) (*citing Parker v. EnerNOC, Inc.*, 484 Mass. 128 (Mass. 2020)). A commission is "definitely determined" when it is "'arithmetically determinable,' taking into account the '*applicable formulas and deductions' and the 'total from which deductions would be taken*.'" *See Klauber*, 80 F.4th at 11 (emphasis supplied) (*citing Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 779 (Mass. App. 2007)). But even if a commission is susceptible to definite determination, it is not "due and payable" until all "dependent contingencies have been met." *Ellicott v. Am. Cap. Energy, Inc.*, 906 F.3d 164,

---

[3] Plaintiffs also fail to account for portions of the supposed expenses that result in a change in T&B's equity accounts, resulting in an increase in the value of T&B's equity in its distribution rights which in turn increases the value of Plaintiffs' equity interest in T&B.

169 (1st Cir. 2018). The default rule is that a commission "becomes due and payable when the employee closes the sale, even if there is a delay in actual payment on the sale;" however, an employer and employee may agree to different terms, thus modifying or eliminating the default rule. *See Klauber*, 80 F.4th at 11. In such instances, "courts apply the terms of the plan." *Id*.

To the extent Plaintiffs are deemed employees, the terms and conditions of Plaintiffs' commission formula provide that Plaintiffs' commissions are earned only after certain contingencies are met, including, the allocation of certain costs, including, stale charges, note payments, and defined administrative and warehouse fees. *[ECF 58]* SOMF at ¶ 20. In other words, the costs are an integral part of the commission formula itself and are not an after the fact deduction from an already due and payable commission. Indeed, Plaintiffs admit they accepted the terms and conditions of the Distributor Agreements but now claim that the contingencies therein amount to a "special contract[]" designed to circumvent *M.G.L. c. 149 § 148B*. To the contrary, "employers and employees may agree to contingencies that must be satisfied before commission payments become due and payable such that they qualify as protected earnings for Wage Act purposes." *See Klauber*, 80 F.4th at 12; *see also Vonachen v. Comput. Assocs. Int'l*, 524 F. Supp. 2d 129, 134-35 (D. Mass. 2007) (enforcing provision giving employer "explicit discretion" to adjust commissions for large transactions); *Daly v. T-Mobile USA, Inc.*, 110 N.E.3d 1220, *5 (2018) (unpublished opinion) (concluding that provision in employment manual allowing employer to adjust commission formula before commissions became "due and payable" was enforceable).

## C.     Plaintiffs Fail to State a Valid Minimum Wage Claim, Entitling Defendants to Summary Judgment on Count III

Contrary to Plaintiffs' argument, Defendants do not contend that they are "[exempt] from the requirement to pay minimum wages simply because the Plaintiffs had sufficient cash flow in

their business' account to pay themselves an amount sufficient to exceed the established minimum wage." Defendants merely state a fact: T&B is responsible for compensating Plaintiffs, just like T&B's other employees, for the services that Plaintiffs perform for T&B, in compliance with the Massachusetts minimum wage law, and in fact T&B did compensate Plaintiffs and its other employees each and every week. *See [ECF 58]* SOMF at ¶ 45.

Assuming *arguendo* that Plaintiffs are Defendants' employees, Plaintiffs only dispute the payment of minimum wages for two weeks from 2018 onward. Thus, Defendants are entitled to summary judgment on those remaining weeks. However, as to the two weeks allegedly in dispute, Plaintiffs fail to use the appropriate method of calculation. "[W]hen an employee is paid on a piece work basis, salary, or any basis other than an hourly rate, the regular[-] hourly rate shall be determined by dividing the employee's total weekly earnings by the total hours worked during the week." *454 CMR 27.02*. Here, Plaintiffs took the total revenue earned by T&B, subtracted the compensation T&B paid to one other T&B employee but not the compensation paid to all T&B employees, and divided by two. Plaintiffs do not provide any legal support for their calculation.

Finally, Plaintiffs did not identify unpaid minimum wages as an element of their damages in their initial disclosures or when identifying their damages as part of their supplemental discovery responses. Given their failure to provide this information, they should not now be able to claim unpaid minimum wages as part of their damages. *[ECF 58-28]* Margarito Canales' Supplemental Answers to Defendants' First Set of Interrogatories at Interrogatory No. 4; *see also Fed. R. Civ P. 37(c)(1)* ( "If a party fails to provide information … as required by <u>Rule 26(a) or (e)</u>, the party is not allowed to use that information … to supply evidence on a motion ... unless the failure was substantially justified or is harmless."); *see also Crawford-Brunt v. Kruskall*, 489 F. Supp. 3d 4, 10 (D. Mass. 2020) (where this Court opined that *Fed. R. Civ P. 37(c)(1)* "weigh[s]

in favor of excluding plaintiff's evidence" when it is not produced in accordance with *Fed. R. Civ P. 26(a)*).

**D.    Even If Deemed Employees, Plaintiffs Fail to Identify Any Valid Legal Argument Entitling Them to Overtime Compensation under Massachusetts Law**

Plaintiffs throw a hail mary by arguing that this Court should graft on to the overtime exemption for truck drivers and helpers under *M.G.L. c. 151 § 1A(8)* the federal statutory small vehicle exception that is included in the Fair Labor Standard Act's Motor Carrier Act ("MCA") overtime exemption despite the fact that the Massachusetts Legislature could have but did not do so. Statutory language that is clear and unambiguous, as is *M.G.L. c. 151 § 1A(8)*, is "conclusive as to legislative intent." *Monell v. Boston Pads, LLC*, 471 Mass. 566, 31 N.E.3d 60 (2015). Here, Plaintiffs cut against the grain and make this argument even though the plain language of the overtime exemption set out in *M.G.L. c. 151 § 1A(8)* contains no such small vehicle exception.

The plain language of the state overtime exemption applies to all truck drivers and helpers who are subject to the jurisdiction of the Department of Transportation. The Massachusetts exemption for truck drivers and helpers does not mirror the federal MCA overtime exemption and never has. Since its enactment in 1960, the Massachusetts exemption has always only applied to truck drivers and helpers. When Congress enacted the FLSA in 1938, Congress provided that its overtime pay requirements should not apply with respect to drivers, drivers' helpers, loaders, and mechanics employed by motor carriers who engage in performing tasks that affect the safety of vehicles operating in interstate commerce. The MCA overtime exemption also relates to "motor vehicles" in interstate commerce rather than just to drivers of trucks and their helpers. In 2002, as part of a Massachusetts wage opinion, the Wage and Hour Division of the Massachusetts Department of Labor noted that there are substantive differences between the Massachusetts and

federal exemptions that must be recognized, including the narrower subset of jobs covered by the Massachusetts exemption. *Opinion Letter MW-02-26-02*.

In 2008, Congress amended the federal exemption via the *SAFETEA-LU Technical Corrections Act of 2008*, Pub. L. No. 110-244, § 306(a), (c), 122 Stat. 1572, 1621 (2008), and added the small vehicle exception to the federal exemption. Notably, Massachusetts did not follow suit. *See M.G.L. c. 151 § 1A(8) and 29 U.S.C. § 213(b)(1)*. While Plaintiffs note Congress' 2008 amendment to the FLSA, creating the small vehicle exception, they brush over the fact that Massachusetts did not similarly amend *M.G.L. c. 151 § 1A(8)*. In fact, in a 2009 Opinion Letter on the topic, the Massachusetts Division of Occupational Safety ("Division") agreed with the 2002 opinion referenced above, holding that the agency "does not interpret the word 'truck' [as used in *M.G.L. c. 151 § 1A(8)*] to be the same as the words 'motor vehicle' as used in federal law." *Opinion Letter MW-09-09-09*.[4]

Given the plain language of *M.G.L. c. 151 § 1A(8)*, the Court should reject Plaintiffs' argument to create new law by creating a small vehicle exception where none currently exists. Accordingly, as Plaintiffs do not dispute that they are truck drivers as that term is used in *M.G.L. c. 151 § 1A(8)*, they are not entitled to the payment of any overtime even if deemed employees of any of the Defendants.

Even if *M.G.L. c. 151 § 1A(8)* could somehow be interpreted to incorporate the federal small vehicle exception, Defendants would still be entitled to summary judgment on Count IV. Canales testified at his deposition that he drives T&B's company trucks seven days per week, both for his delivery days and his merchandising days. *[ECF 59-3]* Canales Depo. at 278. And, although

---

[4] The Division reasoned that: Had the Massachusetts legislature intended the exemption in G.L. c. 151, § 1A(8) to be interpreted in the same way as the Motor Carrier exemption, it would have used the same language as that exemption, as it did in other parts of the statute. *Opinion Letter MW-09-09-09*.

Bardzik testified that he uses his personal vehicle, a Chevrolet Silverado, for purposes of driving between T&B's customer locations on his merchandising days, his claimed use of his personal vehicle does not defeat the exemption. *[ECF 59-4]* Bardzik Depo. at 72.[5] Finally, Plaintiffs' attempt to qualify themselves for the non-existent Massachusetts' small vehicle exception through affidavits which contradict deposition testimony is not permitted to avoid summary judgment. *[ECF 59-5]* Canales Affidavit; *[ECF 59-6]* Bardzik Affidavit; *see also Quintana-Dieppa v. Dept. of Army*, 130 F.4th 1, 12 (1st Cir. 2025) (reiterating a warning to the litigants that "following discovery, a party may not use a later affidavit to contradict facts previously provided to survive summary judgment.").[6]

In their last ditch effort to save their fatally flawed claim for overtime compensation, Plaintiffs, in an almost afterthought, claim in a single sentence without explanation, that the Federal Aviation Administration Authorization Act ("FAAAA) preempts *M.G.L. c. 151 § 1A(8)*. Conclusory statements regarding preemption are not by themselves a basis to find preemption. *DaSilva v. Border Transfer of MA, Inc.*, 227 F. Supp. 3d 154, 159 (D. Mass. 2017). In this regard, the citations following Plaintiffs' one sentence argument do not support Plaintiffs' position. Furthermore, when determining the preemptive scope, if any, of a federal statute, Congressional intent is the relevant touchstone along with an inherent presumption against preemption. *Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 17 (1st Cir. 2014) (*quoting Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013)); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (noting that the presumption against preemption applies "in all preemption cases" and

---

[5] Bardzik's use of a personal vehicle, simply to travel from his home to visit stores on non-delivery days, does not constitute work as a driver on a vehicle "in transportation on public highways in interstate commerce." *See Pub. L. 110-224*, *122 Stat. 1572*, *§ 306(c)*; *49 U.S.C. § 13102(23)* (defining "transportation" as the use of A motor vehicle or other equipment "related to the movement of . . . property").

[6] If Plaintiffs wished to attempt to invoke the small vehicle exception, they could have asserted a claim for overtime under the FLSA. They did not do so.

is especially strong in areas of traditional state regulation (internal quotation marks and brackets omitted)). The FAAAA's preemptive provision prohibits States from "enact[ing] or enforce[ing] a law ... related to a price, route, or service of any motor carrier ... with respect to the transportation of property." *49 U.S.C. § 14501(c)(1)*. In enacting this language, Congress was focused on deregulation and market efficiencies. *H.R. CONF. REP*. 103-677, 86, 1994 U.S.C.C.A.N. 1715, 1758 (where Congress noted that "State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. … Lifting of these antiquated controls will permit our transportation companies to freely compete more efficiently and provide quality service to their customers. Service options will be dictated by the marketplace; and not by an artificial regulatory structure."). In *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 368 (2008), the United States Supreme Court confirmed that the "state laws whose effect is forbidden under federal law are those with a _significant_ impact on carrier rates, routes, or services." *Rowe*, 552 U.S. at 375 (emphasis added).

Plaintiffs have turned the preemption argument upside down. The state overtime exemption lessens Massachusetts wage laws' impact on carrier rates, routes, or services. Thus, there can be no finding that *M.G.L. c. 151 § 1A(8)* has a significant impact on carrier rates, routes, or services. It also furthers Congress' desire to deregulate the trucking industry, thereby allowing the market to determine rates, routes, and services in order to encourage market efficiencies.

## II.    CONCLUSION

For all of the forgoing reasons, and those set forth in Defendants' primary Memorandum of Law in Support of their Motion for Summary Judgment, Defendants are entitled to Summary Judgment on all four remaining Counts.

Dated:  June 5, 2025

Respectfully submitted,

Lepage Bakeries Park Street, LLC, CK Sales Co., LLC, and Flowers Foods, Inc.,

By their attorneys,


 /s/ Frederick B. Finberg
Frederick B. Finberg, Esquire, BBO #624960
rfinberg@thebennettlawfirm.com
Peter Bennett, Esquire, BBO # 669083
pbennett@thebennettlawfirm.com

THE BENNETT LAW FIRM, P.A.
75 Market Street, Suite 201
Portland, Maine 04101
207.773.4775 (Telephone)
207.774.2366 (Facsimile)


## CERTIFICATE OF SERVICE

I, Frederick B. Finberg, hereby certify that on June 5, 2025, I filed the foregoing via the Court's CM/ECF system, which will automatically send a notice of filing to counsel of record.


 /s/ Frederick B. Finberg

B0151328.10

13