UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARGARITO V. CANALES and            *
BENJAMIN J. BARDZIK,                *
                                    *
        Plaintiffs,                 *
                                    *
        v.                          *
                                    *
                                    *    Civil Action No. 21-cv-40065-ADB
LEPAGE BAKERIES PARK STREET, LLC;   *
CK SALES CO., LLC; and FLOWERS      *
FOODS, INC.,                        *
                                    *
        Defendants.                 *
                                    *
                                    *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiffs Margarito Canales and Benjamin Bardzik brought this action against

Defendants Lepage Bakeries Park Street, LLC ("Lepage"), CK Sales Co., LLC ("CK Sales"),

and Flowers Foods, Inc. ("Flowers"), alleging that Defendants deliberately misclassified

Plaintiffs as independent contractors in violation of Massachusetts law and, as a result,

committed other violations of Massachusetts wage statutes. [ECF No. 1 ("Compl.")]. Presently

before the Court is Defendants' motion for summary judgment. [ECF No. 56]. For the reasons

set forth below, Defendants' motion is **DENIED**.

## I.    BACKGROUND

### A.  Material Facts[1]

#### 1.    Defendants' Distribution System

Lepage is a Maine-based company that bakes fresh breads, buns, rolls, and snack cakes. [ECF No. 59-2 ¶ 1].  It is an operating subsidiary of Flowers, a holding company that owns many similar subsidiaries across the country.  [Id.]; [ECF No. 62 ¶ 77].  To distribute its products, Lepage uses a "direct-store-delivery model."  [ECF No. 59-2 ¶ 2].  Under this model, independent distributors order products from Lepage based on retail stores' ongoing needs.  [Id. ¶ 23].  Lepage's bakeries, and, in some cases, other bakeries owned by Flowers, produce products in response to those orders.  [Id. ¶¶ 24–26].  Lepage then "immediately" delivers them to distributors' designated warehouses, [id. ¶ 27], and distributors pick them up "[w]ithin hours" and sell and deliver them to stores, [id. ¶ 30].  Although stores buy Lepage's products from the distributors (and distributors buy them from Lepage), [id. ¶ 8], Flowers publicly refers to the stores as its "customers," see [ECF No. 62 ¶¶ 93–100]; [ECF No. 59-9 (Flowers's 2019 Form 10-K)].

To be able to sell and deliver Lepage's products, distributors must purchase franchise distribution rights from CK Sales, a subsidiary of Lepage, and agree to certain conditions, including uniform quality and operational standards.  [ECF No. 59-2 ¶¶ 2–3, 7].  The relationship between CK Sales and distributors is governed by distributor agreements.  [Id. ¶ 4]; see also [ECF Nos. 58-2, 58-3, 58-4 (distributor agreements)].  Pursuant to those agreements, distributors

---

[1] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts, which consists of Defendants' Statement of Undisputed Material Facts, [ECF No. 58], Plaintiffs' Consolidated Statement of Material Facts, [ECF No. 59-2], Defendants' Reply to Plaintiffs' Consolidated Statement of Material Facts, [ECF No. 62], and documents referenced therein.

buy products from Lepage and sell them to customers in defined geographic "territor[ies]." [ECF No. 59-2 ¶¶ 2, 8, 23]. Distributors generate a profit based on the difference between the price that they pay Lepage and the price they charge customers, [id. ¶¶ 9, 14]; the amount of that profit also depends on the amount of products they sell, see [id. ¶ 15]. CK Sales sells franchise distribution rights in Massachusetts only to corporate entities, see [ECF No. 62 ¶ 83], but the distributor agreements permit the owners of those entities to hire any personnel necessary to operate their businesses; they do not require any one individual to perform all of the distributor's obligations under the agreements, [ECF No. 59-2 ¶ 6]; [ECF No. 58-2 at 16]. The distribution agreements refer to the distributors as "independent contractor[s]." [ECF No. 58-2 at 3].

Distributors are required to use "commercially reasonable best efforts" to service customers in accordance with those customers' established service requirements and to maximize the sale of Lepage's products in their geographic territories. [ECF No. 58-2 at 6–7]. The distribution agreements designate CK Sales as distributors' "limited agent" for purpose of "authorization discussions (including space, position and pricing)" for certain customers, but do not prevent distributors from dealing directly with those customers "with regard to such terms." [Id. at 8]. Some customers communicate directly with Lepage about service requirements and issues as well as promotional and marketing decisions. [ECF No. 62 ¶¶ 113–16].

Some customers ("cash account customers") pay distributors directly. [ECF No. 59-2 ¶ 17]. Others ("charge account customers") pay CK Sales, which collects the payments and remits them to distributors. [Id. ¶¶ 18–19]; [ECF No. 58-2 at 9]. In addition to charging distributors for its products, Lepage also allocates additional costs to them, including "'stale charges,' 'shrink charges,' [territory] note payments, administrative fees, and warehouse fees." [ECF No. 59-2 ¶¶ 20–21]. CK Sales also collects payments from distributors "[f]or items such

as the territory payment, truck lease or purchase, and . . . various insurances," remitting them on distributors' behalf "to the respective entities for which the payments are collected." [Id. ¶ 22]. Distributors receive a weekly "Master Settlement Statement" that "reflects an accounting of debits and credits in the aggregate between [distributors] and Lepage," with products and fees marked as debits owed to Lepage and payments from charge account customers marked as credits owed to distributors. [Id. ¶ 20].

### 2.    Plaintiffs' Business

Plaintiffs initially worked for a temporary staffing agency that serviced Lepage territories that were "open," that is, for which the distribution rights were owned by Lepage, rather than a distributor franchisee. [ECF No. 59-2 ¶ 33]; [ECF No. 62 ¶¶ 80–81]. In 2018, however, they formed a company, T&B Doughboys, Inc. ("T&B"), that acquired the distribution rights to three Lepage territories and then a fourth territory in 2019.[2] [ECF No. 59-2 ¶¶ 35, 40, 42]. Plaintiffs went into business together, at least in part, because they liked their jobs; they also worried that they might lose their jobs if another buyer bought the territories in which they were working. [ECF No. 59-3 at 130]; [ECF No. 59-4 at 59]. Based on the record before the Court, it appears that T&B serviced existing customer accounts and increased sales to some of those accounts, but did not solicit any new accounts, see [ECF No. 58-30 at 13–14]; [ECF No. 59-3 at 189]; the parties dispute whether T&B was, in fact, allowed to solicit new accounts on its own. [ECF No. 59-2 ¶ 11].

Plaintiffs personally delivered bread for T&B five days a week and merchandise two days a week, "averaging roughly 75 hours per week." [ECF No. 59-2 ¶ 48]. T&B initially relied

---

[2] In 2020, T&B sold the distribution rights for one territory back to CK Sales and immediately acquired a different territory. [ECF No. 59-2 ¶ 43].

on the assistance of part-time employees to service its territories and currently employs three employees in addition to Plaintiffs. [Id. ¶¶ 49, 58–60]. Plaintiffs, as T&B's "sole [d]irectors," [id. ¶ 41], hired and had the right to fire T&B's other employees, set their wages and benefits, and assigned them work. [Id. ¶¶ 50–52, 61]. Plaintiffs reported both a fixed annual salary and periodic shareholder distributions of profit from T&B, and it was up to them to decide how much and when T&B paid them. [Id. ¶¶ 67–72].

### A. Procedural History

Plaintiffs initiated this action against Defendants on June 17, 2021, alleging violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148, 148B; violations of the Massachusetts Minimum Fair Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 1A; unjust enrichment; fraud/misrepresentation; breach of contract; and breach of the implied covenant of good faith and fair dealing. [ECF No. 1]. On August 13, 2021, Defendants moved to dismiss or, in the alternative, to compel arbitration under the Federal Arbitration Act. [ECF No. 9]. The Court denied the motion on March 30, 2022. [ECF No. 25]. Defendants appealed that decision, [ECF No. 26], the First Circuit affirmed, [ECF No. 30], and the Supreme Court denied Defendants' petition for a writ of certiorari, [ECF No. 46]. On July 17, 2023, Defendants moved to dismiss or, in the alternative, to stay and compel arbitration under the Massachusetts Uniform Arbitration Act. [ECF No. 38]. The Court denied the motion on October 31, 2023. [ECF No. 43].

On May 1, 2025, after Plaintiffs agreed to dismiss their four common-law claims, Defendants filed the instant motion for summary judgment on Plaintiffs' remaining four statutory claims. [ECF No. 56]. Plaintiffs opposed the motion, [ECF No. 59], Defendants replied, [ECF No. 61], and Plaintiffs filed a surreply, [ECF No. 65].

**II.   LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A fact is considered "material" when "its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5 (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (omission in original) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st

Cir. 1990)).  Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion."  Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)).  The Court, however, "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation modified).

## III.    DISCUSSION

Plaintiffs' four remaining claims depend on a finding that Plaintiffs were Defendants' employees.  For the reasons discussed below, this is a determination that will need to be made by a jury, because Defendants have not established as a matter of law that Plaintiffs were not their employees.  Should the jury find that Plaintiffs were Defendants' employees, their claims are colorable, but if the jury finds that they were not employees, all of the claims will necessarily fail.

In sum, Plaintiffs say that they were, in fact, Defendants' employees, and that Defendants misclassified them as independent contractors, withheld their wages, and failed to pay them a minimum wage or overtime compensation in violation of Massachusetts law.  [ECF No. 1 ¶¶ 40–52].  Defendants attack the premise underlying Plaintiffs' claims, arguing that Plaintiffs were not their employees but rather owners and employees of T&B, a separate corporate entity that purchased franchise rights to sell and distribute Defendants' products in four geographic territories.  [ECF No. 57 at 9–15].  Defendants also argue, in the alternative, that even if Plaintiffs were their employees, they did not withhold their wages or underpay them.  [Id. at 15–22].  Notably, on the key issue of whether Plaintiffs were Defendants' employees, the parties

focus their arguments on the threshold determination of whether Plaintiffs performed services for Defendants, giving rise to a presumption of employment, rather than on whether Defendants have rebutted that presumption by establishing that Plaintiffs were independent contractors. See [id. at 9–15]; [ECF No. 59 at 5–13].

### A.    Misclassification Claim (Count I)

Massachusetts's independent contractor statute prohibits misclassifying employees as independent contractors. Mass. Gen. Laws ch. 149, § 148B(d). The statute "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of [Massachusetts's] wage statutes." Patel v. 7-Eleven, Inc. ("Patel I"), 183 N.E.3d 398, 403 (Mass. 2022) (quoting Somers v. Converged Access, Inc., 911 N.E.2d 739, 747 (Mass. 2009)). Under the statute, there is a presumption that "an individual performing any service . . . shall be considered to be an employee." Mass. Gen. Laws ch. 149, § 148B(a); see also Sebago v. Bos. Cab Dispatch, Inc., 28 N.E.3d 1139, 1146 (Mass. 2015). The putative employer may, however, rebut the presumption of employment by establishing, by a preponderance of the evidence, each of the three following indicia of an independent contractor relationship, known as the "ABC test":

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a); see also Patel I, 183 N.E.3d at 403; Sebago, 28 N.E.3d at 1146. "If any one of these criteria is not shown, the statute directs that the individual is an

8

employee for purposes of [the Massachusetts] wage statutes and entitled to the protections set forth therein." Patel I, 183 N.E.3d at 404–05.

The parties' dispute centers on the "threshold determination" of whether the Plaintiffs "perform[ed] any service" for Defendants within the meaning of the statute. Patel I, 183 N.E.3d at 411 (quoting Mass. Gen. Laws ch. 149, § 148B(a)). Neither party presents any argument on the ABC test or develops or rebuts any argument that, even if the presumption of employment applies, Plaintiffs were independent contractors rather than employees. Accordingly, to be entitled to summary judgment on Plaintiffs' misclassification claim, Defendants must establish, based on undisputed facts, that Plaintiffs did not "perform[] any service" for them, Mass. Gen. Laws ch. 149, § 148B(a).

"By its plain language, the phrase 'performing any service' in the wage and employment context captures carrying out any labor in the interest, or under the direction, of the putative employer, usually (but not always) for remuneration." Patel v. 7-Eleven, Inc. ("Patel II"), 240 N.E.3d 765, 771 (Mass. 2024). "This construction supports the broad, remedial purpose of the independent contractor statute," which the Massachusetts Supreme Judicial Court has "stated is entitled to a 'liberal construction.'" Id. (quoting Sebago, 28 N.E.3d at 1146). Whether the performing-any-service standard is satisfied "depend[s] on the facts of each case," and applying it in the context of a franchise relationship "presents a heightened challenge."[3] Id. "For more than two decades," plaintiffs have challenged "traditional franchisor-franchisee relationships in Massachusetts," including by arguing—as Plaintiffs do here—that they are not true business-to-

---

[3] "'[A] franchise is a business format typically characterized by the franchisee's operation of an independent business pursuant to a license to use the franchisor's' intellectual property, such as its service mark, trademark, trade dress, or trade name." Patel II, 240 N.E.3d at 772 (quoting Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328, 331 (Wis. 2006)).

business or independent-contractor relationships, but rather "disguised employment relationship[s]." Jeffrey M. Rosin, Patel v. 7-Eleven: SJC's Answers to Certified Questions, Boston Bar J., Winter 2025, at 2. Nevertheless, there is "little case law applying the threshold determination" of Mass. Gen. Laws ch. 149, § 148B in the context of franchise relationships, an inquiry made difficult by "the character of a franchise relationship and its intersection with Federal law." Patel II, 240 N.E.3d at 771–72. Specifically, although franchisees typically operate independent businesses, they do so using franchisors' intellectual property. Id. at 772. Franchisors, in turn, must control and supervise the use of their brand to comply with federal law, and, thus, necessarily exercise some measure of control over franchisees' business operations. Id. As a result, "traditional tests for determining employment-based responsibilities are 'not easily transferable' to the usual franchise relationship because strict application 'could have the undesirable effect of penalizing franchisors for complying with Federal law.'" Id. (quoting Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1063 (Mass. 2013)).

The Massachusetts Supreme Judicial Court's decision in Patel II, however, set forth "a few principles . . . that guide [the] analysis." 240 N.E.3d at 772. First, "the label—such as 'franchisee'—used by the parties to characterize their relationship" is not dispositive. Id. at 773. Second, the analysis "focuses on the question whether the individual performs a service for the putative employer," rather than on what "services [are] performed by the putative employer for the individual." Id. at 774. Third, an individual does not "perform[] a service" within the meaning of the statute "simply because a putative employer derives revenue from the sales of its products or services to the individual who is claiming to be an employee[,] . . . regardless of whether the revenue derived . . . from such sales is a fixed fee or an ongoing, percentage-based royalty payment." Id. Fourth, an individual may "perform[] a service" if "the individual carries

10

out labor that renders more attractive the putative employer's products to the employer's customers," even if the individual is "not paid by the putative employer." Id. at 776.

Applying these principles, Patel II held that five plaintiffs who operated convenience stores pursuant to franchise agreements with 7-Eleven did not "perform[] any service" for 7-Eleven within the meaning of Mass. Gen. Laws ch. 149, § 148B. 240 N.E.3d at 767–69. The court found it "significant" that the plaintiffs' customers "consist[ed] of the general public," rather than existing 7-Eleven customers. Id. at 773. It was also "significant" that the franchisees, "rather than opening a retail store under their own name and goodwill, chose to purchase the right to use the 7-Eleven branded business format franchise and to operate their convenience stores using the goodwill and associated market power of that intellectual property." Id. at 774. The court noted that "it appear[ed] that 7-Eleven d[id] not pay the franchisees at all," declining to characterize a payment of the franchisee's store's gross profits that 7-Eleven made to the franchisee, "at the franchisee's election," from a "7-Eleven controlled bank account," as "payment . . . for labor performed by the plaintiffs." Id. at 775–76. Finally, the court rejected the argument that the plaintiffs, by operating their stores "in compliance with certain quality, marketing, and operational standards set by 7-Eleven" designed to "preserve[] the integrity of the brand," were carrying out labor that rendered more attractive 7-Eleven's products to 7-Eleven's customers. Id. at 777–78. Ultimately, the court concluded, the franchise relationship at issue was not an employment relationship, but a "business-to-business relationship in which the franchisees ha[d] chosen to operate their independent businesses using the 7-Eleven business format franchise, to pay 7-Eleven for that use, and to abide by conditions that maintain[ed] the integrity of the 7-Eleven brand." Id. at 778. Because the circumstances "indicate[d] that the franchisees operate[d] independent stores not for 7-Eleven but rather for themselves," the

11

plaintiffs could not satisfy the independent contractor statute's threshold determination.  Id. at 768.

Defendants here argue that Plaintiffs performed services only for T&B, not for Defendants.  [ECF No. 57 at 9].  They note that, under the distributor agreements, Plaintiffs were not required to perform any work at all, [id. at 12]; that Plaintiffs were paid by T&B, not Defendants, [id. at 12–13]; and that compliance with the terms and conditions in the distributor agreements was designed to maintain the integrity of Defendants' brand and should not be construed as labor that renders Defendants' products more attractive, [id. at 13–15].

The facts upon which Defendants rely, however, do not establish as a matter of law that Plaintiffs did not perform any services for them.  That Plaintiffs, were, as a technical matter, employees of T&B is not dispositive because binding case law declines to limit the applicability of Mass. Gen. Laws ch. 149, § 148B to "circumstances where the parties have contracted with one another," which would "undermine" the statute's "broad remedial purpose."  Depianti, 990 N.E.2d at 1067; see also Chambers v. RDI Logistics, Inc., 65 N.E.3d 1, 14 (Mass. 2016) ("The statutory reference to 'individuals who provide services' . . . does not expressly exclude individuals who provide services through a corporation."); DaSilva v. Border Transfer of MA, Inc., 377 F. Supp. 3d 74, 86 (D. Mass. 2019) (holding that incorporation of delivery "drivers who personally provided full-time delivery services" did not preclude Massachusetts Wage Act claims).  Notably, two of the five plaintiffs in Patel II also operated their convenience stores "through . . . corporate entities they own[ed]," but the court did not treat that fact as dispositive. 240 N.E.3d at 768.  So, too, here, the fact that Plaintiffs did not contract with Defendants directly, but, rather, through T&B, a separate corporate entity that they owned and by which they were employed, is not dispositive.  Even if the Plaintiffs here "were found to be employees of

12

[T&B] . . . the lack of a contract between [Plaintiffs] and [Defendants] would not shield [Defendants] from potential misclassification liability." Sebago, 28 N.E.3d at 1147.[4]  It also does not matter whether Plaintiffs were required, under the terms of the distributor agreements, to deliver Defendants' products personally, because Plaintiffs here undisputably did, [ECF No. 59-2 ¶ 48], and the statute asks only whether an individual "perform[s] any service," not whether they were required to do so, Mass. Gen. Laws ch. 149, § 148B; see also Sebago, 28 N.E.3d at 1149 ("Although the plaintiffs were not required to perform services for the radio associations, that is precisely what they did.").

Although it is true that Plaintiffs exercised control over the payments they received from T&B, see [ECF No. 59-2 ¶¶ 67–72], those payments were tied to Plaintiffs' work of delivering Defendants' goods to stores that Flowers publicly characterized as its customers.  See Patel II, 240 N.E. at 775 (noting that "the salient facts" in Sebago for purposes of the statute's threshold determination "were that the [plaintiffs] did the work of driving the [defendants'] clients and in turn were paid therefor by the [defendants]").  In this connection, Defendants' system for paying T&B and, through T&B, Plaintiffs, appears less like the store account maintained by 7-Eleven for its franchisees in Patel II, from which franchisees could withdraw the store's gross profits "at [their] election," see id. at 775–76, and more like the voucher system in Sebago, pursuant to

---

[4] Under Massachusetts law, "the entity for whom [an] individual directly performs services is ordinarily the individual's employer responsible for compliance with the wage laws." Jinks v. Credico (USA) LLC, 177 N.E.3d 509, 516 (Mass. 2021) (emphasis added).  That rule, however, is subject to exceptions, including when a company "'design[s] and implement[s] the contractual framework under which [another company's employee] [is] misclassified as an independent contractor,' specifically to evade obligations under the wage laws," id. at 517 (quoting Depianti, 990 N.E.2d at 1068 n.17), and when "an individual, whose work is controlled by one entity, is also subject to the control of another entity," id. at 520.  The parties have not addressed the applicability of these exceptions here and the Court expresses no view on the issue.

which the putative employer passed on payments from its customers to the plaintiffs for plaintiffs' labor, 28 N.E.3d at 1149.[5]

In sum, based on the current record, the Court cannot find that Plaintiffs did not perform any service for Defendants as a matter of law.  Defendants have not established, through undisputed facts, that Plaintiffs operated their business, T&B, "for themselves," rather than for Defendants.  Patel II, 240 N.E.3d at 768.  The Court finds it "significant" that Plaintiffs, unlike the convenience store owners in Patel II, apparently serviced only existing customer accounts rather than "the general public," 240 N.E.3d at 773, regardless of whether they could have solicited new customers and sold products other than Lepage's, an issue that the parties dispute, cf. Coverall N. Am., Inc. v. Comm'r of Div. of Unemployment Assistance, 857 N.E.2d 1083, 1088 (Mass. 2006) (declining to adopt "capability test" that "considers what an individual is capable of doing as opposed to what an individual actually did").  Despite their ownership of T&B, Plaintiffs personally delivered Defendants' products to stores, Defendants' ultimate buyers—performing many of the same services for Defendants that they performed before forming T&B—and Defendants collected payments for those deliveries from many such buyers, remitting them to Plaintiffs, through T&B, after deducting, among other things, the cost of the products, meaning that Plaintiffs were, in effect, paid for delivering Defendants' products. Although Plaintiffs arguably made a "business decision" to create and operate a business "using the goodwill and associated market power of [Defendants'] intellectual property," Patel II, 240

---

[5] The cases that Defendants cite in their reply, Cook v. Estes Express Lines, Corp., No. 1:16-cv-11538, 2018 WL 1773742 (D. Mass. Apr. 12, 2018), and Debnam v. FedEx Home Delivery, No. 10-cv-11025, 2013 WL 5434142 (D. Mass. Sept. 27, 2013), are distinguishable because the plaintiffs in those cases "offer[ed] much more than their own personal services through legitimate business delivery businesses," DaSilva, 377 F. Supp. 3d at 87 (distinguishing Cook and Debnam on this basis).  Here, by contrast, it is undisputed that Plaintiffs spent a considerable amount of their time personally delivering bread and merchandise.  [ECF No. 59-2 ¶ 48].

N.E.3d at 774, the circumstances here, at least when viewed in the light most favorable to Plaintiffs, indicate that they did, in fact, perform a service for Defendants.  Because Defendants do not argue that all three elements of the ABC test are satisfied, they cannot establish as a matter of law that Plaintiffs were not their employees.  Accordingly, their motion for summary judgment on Plaintiffs' misclassification claim is denied.

### B.  Wage Act Claim (Count II)

The Massachusetts Wage Act provides that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him" and prohibits employers from exempting themselves from its provisions through "a special contract with an employee or by any other means."  Mass. Gen. Laws ch. 149, § 148.  The Act thus "generally prohibit[s] an employer from deducting, or withholding payment of, any earned wages," even if the employee assents.  Camara v. Att'y Gen., 941 N.E.2d 1118, 1121 (Mass. 2011).  To establish a claim under the Act, a plaintiff must show that (1) "he was an employee"; (2) "his form of compensation constitutes a wage"; and (3) "the defendants violated the Act by not paying him his wages in a timely manner."  Levesque v. Schroder Inv. Mgmt. N. Am., Inc., 368 F. Supp. 3d 302, 312–13 (D. Mass. 2019) (citing Napert v. Gov't Emps. Ins. Co., 36 F. Supp. 3d 237, 241–42 (D. Mass. 2014)).

The Massachusetts Wage Act "does not define 'wages,'" but "the plain and ordinary meaning of the word 'wage' is . . . 'a pledge or payment of usually monetary remuneration by an employer especially for labor or services.'"  Parker v. EnerNOC, Inc., 139 N.E.3d 328, 334 n.11 (Mass. 2020) (quoting Webster's Third New International Dictionary 2568 (1993)).  "Commissions," which are a form of "contingent compensation," Mui v. Mass. Port Auth., 89 N.E.3d 460, 463 (Mass. 2018), "may qualify as wages, sheltered by the Wage Act, in certain

15

circumstances," Klauber v. VMware, Inc., 80 F.4th 1, 10 (1st Cir. 2023).[6] Specifically, the Act

provides that commissions must be paid promptly once their amount, "less allowable or

authorized deductions, has been definitely determined and has become due and payable." Mass.

Gen. Laws. ch. 149 § 148. In other words, whereas "other forms of wages, once earned, are to

be paid on a regular schedule," commissions need to be paid only once certain conditions have

been met. Parker, 139 N.E.3d at 333.

Plaintiffs allege that Defendants unlawfully withheld wages earned by Plaintiffs by

subtracting certain fees from payments made to CK Sales by charge account customers. See

[ECF No. 1 ¶ 44]. Defendants argue that (1) the payments that T&B received from Defendants

were not wages earned by Plaintiffs and (2) even if they were wages, they were "commissions,"

from which Defendants could properly deduct certain expenses before paying them to Plaintiffs.

[ECF No. 57 at 15–17].

Here, as an initial matter, Defendants have not established that the payments that

Plaintiffs received, through T&B, were not "wages" for purposes of the Wage Act. As discussed

supra, a reasonable trier of fact could find that Plaintiffs performed services for Defendants. It

follows that the payments that T&B received based on Plaintiffs' deliveries to chain account

customers can reasonably be characterized as compensation for those services. See Parker, 139

N.E.3d at 334 n.11. Again, the facts that Plaintiffs were employed by T&B and that Defendants

did not pay them directly are not dispositive. See DaSilva, 377 F. Supp. 3d at 86.

---

[6] The Act also does not define "commissions," but the term "is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price." O'Connor v. Kadrmas, 135 N.E.3d 226, 238 (Mass. App. Ct. 2019) (quoting Suominen v. Goodman Indus. Equities Mgmt. Grp., 941 N.E.2d 694, 705 (Mass. App. Ct. 2011)).

Defendants' effort to characterize their payments to T&B as "commissions" and their deductions from those "commissions" as "allowable or authorized," [ECF No. 57 at 16–17], also fails. As an initial matter, the summary-judgment record does not suggest that Defendants' payments to T&B were "contingent" in any relevant sense, Klauber, 80 F.4th at 10–11; the debits and credits between Lepage and Plaintiffs were tallied on a weekly basis, [ECF No. 59-2 ¶¶ 20–22]. More importantly, Defendants provide no support for their contention that the deductions they made were "allowable or authorized" within the meaning of the Wage Act, Mass. Gen. Laws. ch. 149 § 148, and recent cases addressing similar factual scenarios have treated similar deductions as unlawful, see Muniz v. RXO Last Mile, Inc., No. 18-cv-11905, 2023 WL 8851090, at *3–7 (D. Mass. Dec. 21, 2023) (holding that deduction scheme in which employer deducted damages caused by employees from their pay violated Wage Act and noting that certain deductions, including franchise "fees . . . charged only for the privilege of doing business" and "insurance fees," would violate Massachusetts law); DaSilva, 377 F. Supp. 3d at 87–92 (allowing Wage Act plaintiffs to recover damages for deductions made from delivery drivers' compensation). Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' Wage Act claim.

### B. Minimum Wage Claim (Count III)

The Massachusetts Fair Minimum Wage Law requires employers to pay Massachusetts employees for all hours worked at an hourly rate at least equal to the applicable Massachusetts minimum wage. Mass. Gen. Laws ch. 151, §§ 1, 7. The Massachusetts basic minimum wage since 2023 has been $15.00 per hour, id. § 1; the hourly rates for the prior years were $14.25 (2022), $13.50 (2021), $12.75 (2020), $12.00 (2019), and $11.00 (2018), see Act Relative to

17

Minimum Wage, Paid Family Medical Leave & the Sales Tax Holiday, 2018 Mass. Acts ch. 121, §§ 17–21.

Plaintiffs allege that Defendants paid them less than minimum wage. [ECF No. 1 ¶ 47]. Defendants argue that (1) Plaintiffs were employed by T&B and chose how much T&B paid them; and (2) the salary T&B paid Plaintiffs never fell below the applicable minimum wage. [ECF No. 57 at 17–18]. In response, Plaintiffs identify two weeks during which they claim Defendants paid them less than minimum wage, and argue that Plaintiffs' ability to manage their business's cashflow should not absolve Defendants of their responsibilities under Massachusetts law, [ECF No. 59 at 15]; [ECF No. 62 ¶¶ 109–10].[7]

The parties' briefing on these issues is unhelpful. On the one hand, as discussed supra, Defendants have not established that they were not Plaintiffs' employers. Thus, it is hard to see how Defendants' insistence that they did not pay Plaintiffs at all could justify summary judgment in their favor. On the other hand, it appears that Plaintiffs exercised considerable control over

---

[7] In their reply, Defendants object that Plaintiffs "did not identify unpaid minimum wages as an element of their damages" in their initial or supplemental disclosures, arguing that this Court should preclude them from using this information to support their opposition. [ECF No. 61 at 8–9]. Plaintiffs in their surreply do not deny that their disclosures on this issue were belated or even respond to Defendants' objection in any way. See [ECF No. 65]. Because Plaintiffs claimed lost minimum wage as damages in their Complaint, [ECF No. 1 ¶ 49], the Court will not impose "the severe exclusionary penalty provided for by Rule 37(c)(1)" at this stage without the benefit of further briefing, Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., 999 F.3d 37, 47 (1st Cir. 2021) (quoting Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 58 n.1 (1st Cir. 2010)). That said, Plaintiffs had a duty to disclose their computation of damages under Rule 26(a), see AVX Corp. v. Cabot Corp., 251 F.R.D. 70, 77 (D. Mass. 2008), and they bear the burden of showing that any failure to disclose "was substantially justified or is harmless" if they wish to use any undisclosed material at trial, Fed. R. Civ. P. 37(c)(1); Alves v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 293 (D. Mass. 2006). The Court notes that, even if it turns out that Defendants were harmed by any late disclosure, "[p]reclusion is not strictly required," and the Court has broad discretion to impose sanctions that "fit the punishment to the severity and circumstances of the violation." Zampierollo-Rheinfeldt, 999 F.3d at 47 (quoting Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 91 (1st Cir. 2020)).

the timing and amount of payments that they received from T&B, which depended, in part, on

what T&B paid its other employees; they also appear to have admitted that they received above-

minimum wage weekly salaries at least from T&B, see [ECF No. 59-2 ¶¶ 65–69], and identify

only two weeks during which they claim the payments T&B received from Defendants fell

below the applicable minimum wage, [ECF No. 62 ¶¶ 109–10].[8]  Neither party has provided

complete figures for the payments that Defendants made to T&B or that T&B made to all of its

employees.

Just as importantly, neither party has explained how damages are calculated in cases in

which, as here, there is an intermediate entity between the putative employer and its putative

employees, that is, whether what matters is how much and when Defendants paid T&B or how

much and when T&B paid Plaintiffs (and its other employees).[9]  It is not clear, for example, that

---

[8] Defendants argue that they are entitled to summary judgment on all weeks other than the two weeks that Plaintiffs identify.  [ECF No. 61 at 8].  Plaintiffs respond that Defendants "likely" failed to pay them minimum wage in other weeks as well, [ECF No. 59 at 15]; [ECF No. 65 at 5], without providing any corroboration for this assertion.  Because Defendants have not sufficiently established that Plaintiffs received a legal wage, Plaintiffs' failure to prove that they did not receive such a wage for the remaining weeks does not entitle Defendants to summary judgment.  Ocasio-Hernández, 777 F.3d at 4.  That said, if the relevant wage for Fair Minimum Wage Law purposes is Plaintiffs' share of Defendants' weekly payments to T&B and Defendants produce evidence that that wage was above the legal minimum, the burden shifts to Plaintiffs to demonstrate that a jury could reasonably find in their favor on this issue.  Borges, 605 F.3d at 5. Uncorroborated assertions are insufficient to carry that burden.

[9] The Court rejects Defendants' argument that the relevant wages for Plaintiffs can be calculated simply by dividing the fixed annual salary that they reported on their tax returns by the number of weeks in the year.  [ECF No. 57 at 17–18].  For employees paid on a weekly basis, what matters for purposes of the Wage Act is whether Plaintiffs were paid the applicable minimum wage each week.  See Nunez v. Syncsort Inc., 268 N.E.3d 324, 327 (Mass. 2025) ("Under § 148 of the Wage Act, an employer must promptly pay "wages earned" during a given pay period.");  454 Mass. Code Regs. 27.02 (2016) ("[A]n employee shall be paid not less than the applicable minimum wage each week.").  Thus, if the relevant amount for purposes of the Wage Act is what Defendants paid T&B (and assuming that Plaintiffs are the only employees who must be paid from that amount), Defendants violated the Wage Act in any week in which they paid T&B less than the applicable minimum wage for Plaintiffs, regardless of whether they paid T&B more than minimum wage in any other week.

Defendants should be held accountable for the fact that Plaintiffs chose to hire and perhaps overpay additional employees and to pay themselves correspondingly lower salaries—issues seemingly beyond the control and knowledge of Defendants.[10]  Nonetheless, based on the current record and briefing, the Court cannot grant Defendants' motion for summary judgment on Plaintiffs' Fair Minimum Wage Law claim.

### C.  Overtime Claim (Count IV)

Massachusetts state law provides a right to overtime compensation.  Specifically, Mass. Gen. Laws 151, § 1A provides that "no employer in the commonwealth shall employ any of his employees . . . for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed."  To establish a claim for unpaid overtime, a plaintiff must show "both that he incurred unpaid overtime work, and that the employee had actual or constructive knowledge that he was working overtime."  Austin v. Ken's Foods, Inc., 772 F. Supp. 3d 163, 174 (D. Mass. 2025) (quoting Gendron v. Kinjawi, No. 22-cv-11910, 2025 WL 604954, at *8 (D. Mass. Feb. 25, 2025)).

The Massachusetts overtime law is subject to exemptions.  O'Brien v. Lifestyle Transp., Inc., 956 F. Supp. 2d 300, 307 (D. Mass. 2013).  As relevant here, the statute exempts any employee who is employed "as a bona fide executive, or administrative or professional person or qualified trainee for such position earning more than eighty dollars per week."  Mass. Gen. Laws 151, § 1A(3).  It also exempts any employee employed

> as a driver or helper on a truck with respect to whom the Interstate Commerce
> Commission has power to establish qualifications and maximum hours of service

---

[10] Similarly, with respect to Plaintiffs' overtime claim, it is not clear that Defendants should be held accountable for the fact that Plaintiffs chose to work more than forty hours each week rather than hire additional employees.

pursuant to the provisions of section two hundred and four of the motor carrier act of nineteen hundred and thirty-five, or as employee of an employer subject to the provisions of Part 1 of the Interstate Commerce Act or subject to title II of the Railway Labor Act.

Id. § 1A(8).  An employer claiming entitlement to an exemption bears the burden of proving that the exemption applies.  See Somers v. Converged Access, Inc., 911 N.E.2d 739, 748 n.12 (Mass. 2009).  Defendants argue that they are entitled to summary judgment on Plaintiffs' overtime claims because Plaintiffs fall under these two exemptions.  [ECF No. 57 at 18–20].

The Court disagrees.  With respect to the exemption for "bona fide . . . administrative" employees, Mass. Gen. Laws 151, § 1A(3), Massachusetts courts have "embraced the United States Department of Labor's interpretation" of the corresponding exemption in the federal Fair Labor Standards Act.  Casseus v. E. Bus Co., 89 N.E.3d 1184, 1195 (Mass. 2018) (citing Goodrow v. Lane Bryant, Inc. 732 N.E.2d 289, 294 (Mass. 2000)).  Under that interpretation, to establish that Plaintiffs were bona fide administrative employees, Defendants must show, among other things, that Plaintiffs' "primary duty" (1) was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (2) "include[d] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs," which is determined "based on all the facts in a particular case."  Id. § 541.700(a).  The amount of time spent performing exempt work is "a useful guide in determining whether exempt work is the primary duty of an employee."  Id. § 541.700(b).  "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but even "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may . . . meet the primary duty requirement" under certain circumstances."  Id.

21

Here, Defendants assert that Plaintiffs' "primary duties" were supervisory and managerial, [ECF No. 57 at 22], but, although it is undisputed that Plaintiffs had such duties, Defendants have provided no factual support for their assertion that they were Plaintiffs' principal, main, major, or most important duties, see [ECF No. 59-2 ¶¶ 60–61]. Moreover, it is undisputed that Plaintiffs averaged roughly seventy-five hours per week personally delivering bread and merchandise. [ECF No. 59-2 ¶ 48]. The fact that they spent such a significant amount of time on work that was not exempt "office or non-manual work," 29 C.F.R. § 541.200(a)(2), strongly suggests that they were not bona fide administrative employees, see id. § 541.700(b). Because Defendants have not established that Plaintiffs' primary duties were administrative, they have not shown that Plaintiffs were exempt from the overtime statute under Mass. Gen. Laws 151, § 1A(3). Ocasio-Hernández, 777 F.3d at 4.

The statute's exemption for truck drivers and drivers' helpers, Mass. Gen. Laws ch. 151, § 1A(8), also closely tracks an exemption in the Fair Labor Standards Act, 29 U.S.C. § 213(b)(1), with a couple of important differences. O'Brien, 956 F. Supp. 2d at 308. First, whereas the federal exemption applies to "employees and those only whose work involves engagement in activities consisting wholly or in part of . . . that of a driver, driver's helper, loader, or mechanic," 29 C.F.R. § 782.2(b)(2), the Massachusetts exemption applies only to a subset of those workers, namely those employed as "a driver or helper on a truck," Mass. Gen. Laws ch. 151, § 1A(8). See Mass. Dep't of Labor Standards, Minimum Wage Opinion Letter (Feb. 26, 2002); see also Mullally v. Waste Mgmt. of Mass., Inc., 895 N.E.2d 1277, 1283 (Mass. 2008) (noting that Department of Labor opinion letters are "entitled to deference" provided that they are "not contrary to the plain language of the statutes or their underlying purposes"). Second, whereas the federal exemption applies to individuals who drive or are required to ride on

a "motor vehicle," 29 C.F.R. § 782.3–4, the Massachusetts exemption applies only to drivers and helpers on a subset of motor vehicles, namely, those "that can fairly be defined as a truck," which excludes "passenger sedans," "passenger sport utility vehicles," "minivans," "limousines," "sport utility limousines," "passenger carrier vans," "minibuses," or "buses," Mass. Dep't of Labor Standards, Minimum Wage Opinion Letter (Sept. 9, 2009).

Here, Defendants argue that "there can be no dispute that Plaintiffs [were] 'drivers on a truck'" within the meaning of Mass. Gen. Laws ch. 151, § 1A(8), such that they were exempt from the overtime laws. [ECF No. 47 at 19]. Plaintiffs point out, however, that they "each spent several hours every week driving personal vehicles . . . in order to distribute the Defendants' products." [ECF No. 59 at 16]; see also [ECF No. 62 ¶ 111].[11]

Based on this record, the Court cannot determine as a matter of law that Plaintiffs fall outside the protections of the overtime statute as drivers "on a truck." Mass. Gen. Laws ch. 151, § 1A(8). The parties have not directed the Court to any caselaw on the issue of whether drivers who spend some portion of their time driving vehicles that are not trucks within the meaning of Mass. Gen. Laws ch. 151, § 1A(8) are exempt from the Massachusetts overtime statute. Federal decisions addressing situations where employees are driving both exempt and non-exempt

---

[11] Defendants argue that Plaintiffs' affidavits on this issue are inadmissible because they contradict their prior deposition testimony. [ECF No. 61 at 11–12]; [ECF No. 62 ¶ 111]. The sham affidavit rule, however, applies only when the party opposing summary judgment provides an affidavit that clearly contradicts prior testimony. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994). Here, there is no such clear contradiction. Canales testified that he "drive[s] the trucks around seven days a week" and "take[s] out the truck every day." [ECF No. 59-3 at 278]. And Bardzik testified that he used his "personal vehicle" to do "pullups," [ECF No. 59-4 at 42], which Defendants suggest means "to travel from his home to visit stores on non-delivery days," [ECF No. 61 at 11 n.5]. Plaintiffs' affidavits, in which they state that they used their personal vehicles for at least several hours each week to perform delivery work, [ECF No. 59-5 at 2]; [ECF No. 59-6 at 1–2], are not inconsistent with this deposition testimony.

vehicles for purposes of the Fair Labor Standards Act's analogous exemption, however, have generally held that such employees were covered by the Act, unless defendants provided evidence that the use of exempt vehicles wholly predominated.  See O'Brien, 956 F. Supp. 2d at 305–07 (holding that employee who alleged that the vehicles he drove "included [non-exempt] small vehicles during most or all workweeks," id. at 302, stated plausible Fair Labor Standards Act claim); see also Brooks v. Halsted Commc'ns, Ltd., 620 F. Supp. 2d 193, 200–03 (D. Mass. 2009) (collecting cases and noting that "[t]he weight of district court authority" favored the position that "motor carrier[s] . . . with drivers operating vehicles weighing both above and below 10,000 pounds" were subject to the Fair Labor Standards Act's overtime provisions). Here, the summary-judgment record does not contain figures indicating, even approximately, how many hours Plaintiffs spent driving trucks as opposed to other vehicles.  Because Defendants have not articulated a standard for determining when employees who spend time using both exempt and non-exempt vehicles are exempt from the requirements of the Massachusetts overtime statute under Mass. Gen. Laws ch. 151, § 1A(8) or established that Plaintiffs satisfied that standard, they are not entitled to summary judgment on Plaintiffs' overtime claim.

## IV.      CONCLUSION

For the reasons set forth above, Defendants' motion, [ECF No. 56], is **DENIED**.

**SO ORDERED.**

March 30, 2026                                            */s/ Allison D. Burroughs*
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE

24